**No. 23-55088**

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

YAAKOV MARKEL

Plaintiff-Appellant

v.

UNION OF ORTHODOX JEWISH
CONGREGATIONS OF AMERICA, a Corporation;
NACHUM RABINOWITZ

Defendants-Appellees.

On Appeal from the United States District Court
For the Central District of California
No.  2:19-cv-10704-JHW-sk
Hon. John W. Holcomb

_____

**APPELLANT'S OPENING BRIEF**

_____

Steven R. Friedman State Bar No. 100748
Michael E. Friedman State Bar No. 291694*
Friedman² LLP
1880 Century Park East, Suite 1411
Los Angeles, CA 90067
Telephone: (310) 273-2505
Email: LegalSolutionsEmail@gmail.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    NEARLY ALL OF THE MATERIAL FACTS UNDERLYING

       APPELLANT'S CLAIMS ARE DISPUTED THEREFORE THE COURT

       SHOULD NOT HAVE GRANTED SUMMARY JUDGMENT. . . . . . . . 15

       A.  Markel Is Not a Minister . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.    THE HISTORY OF THE MINISTERIAL EXCEPTION
       DEMONSTRATES IT WAS NOT INTENDED TO APPLY TO
       MARKEL'S CASE. MARKEL IS NOT SUING FOR DISCRIMINATION
       OR WRONGFUL TERMINATION AND IS INSTEAD FOCUSED ON
       MONEY APPELLEES AGREED TO PAY HIM AND WHICH THEY DID
       NOT PAY BECAUSE THEY DISPUTE THE NUMBER OF HOURS
       MARKEL WORKED.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       A.    The Ministerial Exception Has Been Applied In Cases Involving the
             Hiring, Firing, Disciplining or Training of A Minister, Not In the
             Context Of How Much An Employee Should Be Paid For Hours
             Worked. The District Court Committed Prejudicial Error In
             Expanding the Ministerial Exception to Appellant's Case.  . . . . . . . 32

III.   EVEN ASSUMING APPELLANT WAS A MINISTER AND APPELLEES
       QUALIFIED AS A RELIGIOUS ORGANIZATION, THIS COURT
       COULD STILL REVERSE AND ORDER A TRIAL BECAUSE THE
       DISPUTED QUESTIONS WHICH REQUIRE RESOLUTION ARE AKIN
       TO A BREACH OF CONTRACT AND DO NOT TOUCH UPON
       RELIGION OR A RELIGIOUS DECISION. . . . . . . . . . . . . . . . . . . . . . . . 38

A.   The Ministerial Exception Does Not Apply.  Applying The Minimum Wage Laws to This Case Would Not Violate Either of the Religion Clauses of the First Amendment Because None of the OU's Decisions Regarding Payments to Markel's Were Related to Religion And There Is No Claim That Appellee's Religion Conflicts With the California Minimum Wage or Overtime Laws. . . . . . . . . . . . . . . . 42

B.   The Evidence Shows That the OU Routinely Paid Overtime to Markel and  People In Markel's Position.  Requiring the OU to Comply with California Overtime Law Does Not Impact Any Religious Decision by the OU.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44


IV.   *ALCAZAR V. CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE* INVOLVED DIFFERENT FACTS AND DOES NOT SUPPORT THE EXPANSION OF THE MINISTERIAL EXCEPTION TO THE INSTANT CASE WHERE NO RELIGIOUS TRAINING OR ORDINATION WAS INVOLVED AND THE APPELLEE IS SIMPLY AN EMPLOYEE WORKING HOURLY FOR PAY.  . . . . . . . . . . . . . . . . . . . 48

A.   The First Amendment Does Not Bar Employment Claims, Including Minimum Wage Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

V.    THE OU IS NOT A RELIGIOUS INSTITUTION AND IS INSTEAD A

       BUSINESS LICENSING ITS TRADEMARK FOR A FEE. . . . . . . . . . . . 55

       A.    The OU Has Stated in Other District Courts That Its Business of

              Kosher Certification "Is Not Religious Exercise." . . . . . . . . . . . . . . 57

       B.    The OU Received $10 Million of Federal PPP Loan Forgiveness by

              Representing to the SBA that the OU Was "Most Aptly" Classified as

              a Food Service Contractor Not A Religious Organization. . . . . . . . 59

       C.    Appellees' Testimony in this Case Tacitly Admitted That the OU's

              Kosher Certification Is Not a Religious Act By Contrasting Kosher

              Certification With Acts Which the OU Believes Qualify As Religious

              Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

       D.    The OU Licenses Their Trademark As A Marketing Tool To Be Put

              On All Sorts of Inedible Items and Poisons For Which They Admit

              Kosher Certification Is Not Required. . . . . . . . . . . . . . . . . . . . . . . 61

       E.    Appellees Incorrectly Relied Upon *Conlon*, and *Schmoll.* . . . . . . . . 62

       F.    Other Cases Discussing Religious Entities Show the OU is a

              Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VI.   MARKEL IS NOT A MINISTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A.      The Ministerial Exception Requires a Fact Intensive Analysis and the

Court Erred In Applying A Rigid Formula To Appellant. . . . . . . . . 65


VII.  MARKEL'S CLAIMS FOR FRAUD AND NEGLIGENT

MISREPRESENTATION ARE NOT DEFEATED BY THE

MINISTERIAL EXCEPTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

STATEMENT OF RELATED CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

# TABLE OF AUTHORITIES

## CASES

*Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 32, 47, 48, 49, 50, 52, 62, 68

*Bollard v. Cal. Province of the Society of Jesus,* 196 F.3d 940 . . . . . . . . . . 53, 57

*Calvary Chapel of Bangor v. Mills,* 459 F. Supp. 3d . . . . . . . . . . . . . . . . . . . . . 43

*Celotex Corporation v. Catrett,* 477 U.S. 317. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Conlon v. InterVarsity Christian Fellowship,* 777 F.3d 829 . . . . . . . . . . . . . 61, 62

*Cornwell v. Electra Central Credit Union,* 439 F.3d 1018. . . . . . . . . . . . . . 15, 22

*Disabled Rights Action Committee v. Las Vegas Events, Incorporated.,* 375 F.3d 861. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Elvig v. Calvin Presbyterian Church,* 397 F.3d 790 . . . . . . . . . . . . . . . . . . . 38, 52

*Hosanna-Tabor Evangelical Lutheran Church and Schools v. E.E.O.C.,* 565 U.S. 171. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kohler v. Bed Bath and Beyond of California, LLC,* 778 F.3d 827 . . . . . . . . . . 13

*League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181 . . . . . . . . . . . . . . 13

*Lemon v. Kurtzman,* 403 U.S. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Malik v. Brown,* 16 F.3d 330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*McClure v. Salvation Army,* 460 F.2d 553 . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 62

*Minker v. Baltimore Ann. Conf. of United Methodist Church,* 894 F.2d 1354 . . . 39

*Our Lady of Guadalupe School v. Morrissey-Berru* (2020)
140 S.Ct. 2049. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32, 33, 34, 35, 36, 37, 38,
62, 64, 65

*Petruska v. Gannon Univ.,* 462 F.3d 294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133 . . . . . . . . . . . . . . . . . . . . . 14

*Schmoll v. Chapman Univ.,* 70 Cal. App. 4th 1434. . . . . . . . . . . . . . . . . . . . . . 62

*Shaliehsabou v. Hebrew Home of Greater Washington, Incorporated,* 363

> F.3d 299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 62

*Spencer v. World Vision, Incorporated,* 633 F.3d 723 . . . . . . . . . . . . . . . . . 63, 64

*Sumner v. Simpson Univ.,* 27 Cal. App. 5th 577(2018). . . . . . . . . . . . . . . 39, 40, 62

*Thompson v. D.C.,* 832 F.3d 339. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tony and Susan Alamo Foundation v. Secretary of Lab.,* 471 U.S. 290 . . . . . . . 52

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918 . . . . . . . . . . . . . . . . . . . . . 15

*Werft v. Desert Southwestern Annual Conference of the United Methodist Church,*
377 F.3d 1099 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 53

*Yeager v. Bowlin,* 693 F.3d 1076 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATUTES

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed.R.Civ.P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## INTRODUCTION

"**Kosher food, in and of itself, has no religious significance.**" (4-ER-475 bold added). Kosher "**describe[s] the physical characteristics of foods** . . . **the dietary standards are** absolutely clear, entirely undisputed, and **remarkably mundane**. . . **In no event does the determination depend on any spiritual factor.**"(4-ER-472-473 bold added). These **are Appellees' statements to a different Federal Court** seeking to continue making money from the State of New York.

To receive $10 million of PPP funds Appellees told the Federal Small Business Administration (SBA) that they were "most aptly" a Food Service Contractor, not a Religious Organization. (5-ER-702¶3).

But that is not what Appellees told the District Court in this case when they sought to invoke the Ministerial Exception to exempt them entirely from ALL California wage and hour laws, including the minimum wage, overtime, and doubletime. Appellee Union of Orthodox Jewish Congregations of America, (also known as the "OU") was Markel's employer and Nachum Rabinowitz was Markel's supervisor and argued that its $120,000,000 business was a religious organization.

In a matter of first impression, the District Court, feeling bound by

1

Appellees' incorrect interpretation of this Court's narrow ruling in *Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288, extended the Ministerial Exception of the First Amendment to apply to a Appellees where all of the essential material facts are disputed. Based upon this incorrect ruling the District Court granted summary judgment as to all of Appellant's claims, finding that the Ministerial Exception acted as a total bar to ALL employment claims, wage and hour claims and fraud claims. That decision should be reversed entirely.

The District Court recognized this was a matter of first impression but misapplied the Ministerial Exception in granting summary judgment.

The Ministerial Exception is designed to exempt religious organizations from certain claims brought by ministers, only if the claims would require an adjudication of a religious decision or a claim which impacts the organization's ability, to select, hire, fire, train or discipline *their ministers*.

But the claims brought by Appellant Markel, do not require any adjudication of any religious decision. Markel is seeking to be paid for overtime and doubletime he worked when he was an employee of Appellee OU and to recover damages for Appellees' fraud in deliberately making misrepresentations to induce Markel to not take another job. Neither of these claims involves a religious

decision.

In fact, Appellees have never presented any argument or evidence that their failure to pay Markel was the result of a religious decision. Instead, Appellees dispute the hours claimed by Markel. Therefore, to adjudicate Markel's claims at trial, the Court does not need to evaluate or interfere in a religious decision or a religious organization's ability, to select, hire, fire, train or discipline their ministers.

Additionally, it was error for the District Court to grant summary judgment because Appellant's evidence disputes all of the material facts. The Court was prohibited from weighing the evidence or concluding that Appellees are a religious organization or that Markel is a minister because those conclusions are all disputed by evidence submitted by Markel.

Markel's evidence shows that Markel was a factory worker, not a Rabbi, never received ordination, was never engaged in religious education, training, teaching, or preaching. This evidence is sufficient to dispute the claim that Markel was a minister even though he worked for the OU which provided kosher certification.

Markel's evidence also shows that Appellee OU is not a religious organization under any of the tests applied by the Supreme Court. Appellant

3

which licenses its kosher certification trademark for all sorts of marketing purposes unrelated to kosher food, and generates more than $120 million annually from this business conduct. OU does not ordain or train ministers, does not run a religious school, does not operate a synagogue, and the evidence disputes that OU is engaged in any religious activity.

The Ministerial Exception is inapplicable to the instant claims as a matter of law.

Whether Markel is a minister and whether the OU is a religious organization must be left to the trier of fact and cannot be conclusively determined at the summary judgment stage because the evidence is in conflict and the facts are all disputed.

The dismissal of Markel's claims should be reversed.

## JURISDICTIONAL STATEMENT

The District Court obtained jurisdiction after Appellees removed this California wage and hour claim to the Federal District Court under diversity jurisdiction. 28 U.S.C. §§ 1332, 1441(a), 1441(b), 1446(a). (6-ER-972–80)

This Court has jurisdiction under 28 U.S.C. § 1291 because the instant appeal is from the District Court's entry of a final judgment on January 3, 2023,

4

arising from the granting of summary judgment, which disposed of all claims asserted by Markel. (1-ER–2–3; 1-ER-4–30)

Markel timely filed his notice of appeal on January 30, 2023. (6-ER-1007).

## ISSUES PRESENTED FOR REVIEW

1.  Did the District Court err in granting Appellees' motion for summary judgment in its entirety based exclusively upon the Ministerial Exception where Appellant submitted evidence disputing each and every element of the Ministerial Exception, including evidence showing that Appellant Markel was not a minister and evidence disputing that Appellee OU is a religious organization?

2.  Did the District Court commit reversible error in granting summary judgment when strong admissible evidence was adduced by the Appellant to controvert Appellees' contentions that (1) Appellee, who does not operate a church or synagogue, or school and whose admitted business consists of selling its trade mark generating more than $120,000,000 a year, is a religious organization rather than a business organization; and (2) Appellant, who was never ordained, never taught, preached, studied or engaged in any religious act for

5

Appellees qualified as a minister?

3.  Does the Ministerial Exception act as a complete defense to any claim based upon California Labor Law, including the minimum wage laws governing unpaid time, overtime and double time, when the Appellees have failed to submit any evidence or argument showing that religion or a religious decision was *the basis* for Appellees' decisions not to pay Appellant in conformity with California law?

4.  Appellant's complaint seeks payment from Appellee, who was Appellant's employer, for hours he worked prior to Appellant's resignation, including overtime hours and doubletime hours. Appellees agree Appellant resigned but dispute the number of unpaid hours claimed by Appellant.  However, Appellees have not presented any evidence that their refusal to pay Appellant is based upon a religious decision or involves a religious issue of any kind.  Does the Ministerial Exception bar such claims by Appellant as a matter of law such that the matter should not be adjudicated at trial?

5.  Whether the Ministerial Exception applies to persons who are neither clergy, nor students, nor teachers who have no religious function, or title or ministerial duties and whose work never involves ministering

to persons of any faith, who hold no titles or degrees or ordinations and never involves religion, religious practice, prayer or advocacy, training or any contact with people even remotely related to or touching upon belief of any kind.

6. Whether the District Court committed reversible error in finding that the Ministerial Exception acts as a complete defense to any claim based upon California Labor Law, including the minimum wage laws governing unpaid time, overtime and double time, when the Appellees have failed to submit any evidence or argument showing that religion or a religious decision was *the basis* for Appellees' decisions not to pay Appellant in conformity with California law?

7. Whether the Ministerial Exception act as an affirmative defense to claims of Fraud or Negligent Misrepresentation under the present set of facts or at all?

## STATEMENT OF THE CASE

In a matter of first impression the District Court erred in applying the Ministerial Exception to a plaintiff who is not a minister and to an organization which engages in business and not religious activity and whose decisions at issue

7

in this case relate exclusively to business and not to religion.

Appellant and Plaintiff Markel brought a complaint against Defendant and Appellee OU, which was Markel's former employer, and Nachum Rabinowitz who was Markel's former supervisor and was also an OU employee. (6-ER-981–92).

Markel worked at a factory owned by Delano in central California producing grape flavoring and grape concentrate which is a food additive. (4-ER-492¶8; 4-ER-498¶28). Markel's duties involved changing and cleaning hoses and silos, working with other factory workers, sealing drums of grape concentrate, signing bills of lading and sometimes, helping to harvest and crush the grapes. (4-ER-488¶¶7-9; 4-ER-490¶16 ). Markel was an employee of the OU, (4-ER-496¶22; 4-ER-500¶35; 4-ER-501¶41) which licensed its trademark to Delano in exchange for a substantial fee so that Delano could sell some of its grape concentrate and flavoring as kosher certified. (4-ER-492¶8; 4-ER-498¶27).

Markel was often times the only OU employee working at Delano and would work 24 and sometimes 48 hour shifts where he was either actively working on the factory floor, on call waiting to work at the factory, or sleeping on a couch at the factory or in his car. (4-ER-489–90; 4:ER496–97). The OU, an organization with $120 million in annual revenue and whose executives make high six figure salaries (4-ER-556; 4-ER-550; 2-ER-70–71:3-5), expressly told Markel he would

be paid for all hours he worked and his supervisors visited and saw him working 24 and 48 hour shifts. (2-ER-122; 5-ER-681)

The OU and Rabinowitz also agreed to pay Markel for overtime hours he worked, and indeed did pay him on occasion for working overtime hours. (2-ER-128; 2-ER-119-124). The OU has identified no religious or doctrinal objection to paying Markel for overtime hours, or paying him at an increased rate. Indeed, Appellees have not identified any religious issue or decision which would prevent them from fully complying with all of California's minimum wage laws. Instead, Appellees' dispute whether or not Markel worked the hours he claims. 2-ER-107.

Markel voluntarily resigned from the OU in March 2018. (2-ER-110; 4-ER-502¶45). Markel subsequently brought suit in the Los Angeles Superior Court alleging five causes of action (1) Violations of California Labor Code; (2) Unfair Business Practices; (3) Fraud; (4) Negligent Misrepresentation; and (5) Failure to Give Itemized Wage Statements. (6-ER-981–92).

## PROCEDURAL HISTORY

Markel's September 27, 2019 complaint was filed in the Los Angeles Superior Court under California State law. (6-ER-981–92)

On December 18, 2019 Appellees removed the case to the United States

9

District Court for the Central District of California, invoking diversity jurisdiction. (6-ER-972–80). Appellees' answer was filed on March 23, 2020. (6-ER-960).

Appellees filed a motion for summary judgment based exclusively upon the affirmative defense of the Ministerial Exception. (6-ER-955–59). Appellees argued the OU was a religious organization and Markel was a minister and claimed that the Ministerial Exception acted as a complete bar to all of Markel's claims even though no religious decision was identified by Appellees.

As required, a joint compendium of exhibits was submitted to the Court (Joint Exhibits A-F, 4-ER-491–663; 5-ER-665–923) along with a Joint Statement of Undisputed Facts (3-ER205–428) and the depositions of the parties were lodged with the Court. (Docket Numbers 83-85).

Markel filed his opposition on October 14, 2022. (3-ER-175–204). Appellees replied on October 21, 2022. (3-ER-155–170).

The Court heard more than an hour of oral argument on November 4, 2022. (2:-ER-33, 78). At the oral argument the Court concluded:

> "THE COURT: . . . I'm right that there's no Supreme Court or Ninth Circuit authority directly on point for these circumstances; correct? . . . there's nothing directly on point. That's why we're sort of wrestling with these issues; right?

(2-ER-76:22-77:10).

The Court took the matter under submission and on January 3, 2023 granted Summary Judgment as to the entire action based exclusively upon the Ministerial Exception, (1-ER-30) which was the only relief noticed in the Appellees' motion. (6-ER-955–59).

Markel timely filed his notice of appeal on January 30, 2023. (6-ER-1007).

## SUMMARY OF THE ARGUMENT

I.    The Ministerial Exception does not reach every claim presented against a religious organization and does not provide blanket immunity to a religious organization for all claims raised by an employee.  Even assuming *arguendo* that the OU is a religious organization and that Markel was a minister (points which Markel vigorously disputes with substantial evidence), the Ministerial Exception does not act to bar Markel's claims for unpaid wages, overtime and double time because the OU has made no evidentiary or legal showing to demonstrate that its failure to pay Markel was based upon a religious decision or religious issue.  Indeed, Markel's evidence demonstrates that Appellees actually agreed to pay Markel overtime, and did in fact pay Markel for some overtime.  (2-ER-128; 2-ER-119-124).  Markel's claims are therefore more

akin to a breach of contract. But in any event the Ministerial Exception cannot be applied where there is no religious decision identified by Appellees.

Moreover, the Ministerial Exception has historically been applied to wrongful termination and discrimination cases or those cases which touch upon a religious organization's autonomy to make *religious decisions*.

The District Court committed prejudicial error when, in a matter of first impression, the Court expanded the Ministerial Exception and applied it to Markel's claims where no religious decision is at issue and where Markel voluntarily resigned and did not sue for discrimination or wrongful termination.

II.     The District Court erred in granting summary judgment because summary judgment may only be granted where the material facts at issue in the affirmative defense are undisputed. Appellees' motion for summary judgment sought relief based exclusively upon the Ministerial Exception.

Markel submitted substantial evidence to dispute all of the material facts regarding whether Markel was a minister and whether OU was a religious organization. It was OU's burden to demonstrate that all of these facts were undisputed. Given the plethora of evidence disputing Appellees' argument, the District Court was bound to deny summary judgment and send the matter to trial.

12

III.    The District Court further erred in applying the Ministerial Exception to Markel's claims of fraud and negligent misrepresentation.  These claims arise out of deliberate misrepresentations made by Appellees OU and Rabinowitz to Markel which successfully induced reasonable reliance by Markel.  Appellees failed to point to any religious decision or religiously protected issue which served as the underpinning for the fraud and deceit.  It was error for the District Court to extend the Ministerial Exception to these causes of action and to then dismiss Markel's complaint in its entirety.

## STANDARD OF REVIEW

The standard of review for the District Court's granting of summary judgment is de novo: "We review a district court's grant of summary judgment de novo." *Kohler v. Bed Bath & Beyond of California, LLC*, 778 F.3d 827, 829 (9th Cir. 2015). De novo review means that the appellate court views the case from the same position as did the district court. *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002).

The Court then "view[s] the evidence in the light most favorable to the party opposing summary judgment, draw[s] all reasonable inferences in that party's favor, and avoid[s] weighing the evidence or making credibility determinations."

*Thompson v. D.C.,* 832 F.3d 339, 344 (D.C. Cir. 2016) citing *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150, 120 S.Ct. 2097 (2000)

Summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

All "legal conclusions that underlie the district court's decision are reviewed de novo." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 879 (9th Cir. 2004). As such, all elements of the district court's legal analysis or statutory interpretation, including its applications of law to facts and the application of the Ministerial Exception are all reviewed de novo.

14

**ARGUMENT**

## I. NEARLY ALL OF THE MATERIAL FACTS UNDERLYING APPELLANT'S CLAIMS ARE DISPUTED THEREFORE THE COURT SHOULD NOT HAVE GRANTED SUMMARY JUDGMENT.

Under FRCP Rule 56, the moving party seeking summary judgment bears the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP Rule 56(a).

The burden for opposing summary judgment is low:

"The burden on the non-movant is not onerous. [citation] She need not tender evidence in a form that would be admissible at trial. . . . **she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact**."

*Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920–21 (7th Cir. 1994) (bold added).

Declarations, even self-serving declaration, and circumstantial evidence are admissible to defeat summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) citing FRCP Rule 56(c); *Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir. 2012). *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir.

15

2006).

The Ministerial Exception was the *exclusive* basis upon which summary judgment was sought and granted. (6-ER-955–59; 1-ER-4–30). But every material issue regarding the application of the Ministerial Exception to Markel's claims is disputed by admissible evidence submitted by Markel. As a result, summary judgment should have been denied and the matter sent to trial.

This case arises out of two claims. First, a claim by Plaintiff Markel that the OU did not pay him at all for many of the hours that he worked for the OU, and that the OU did not pay him the correct overtime when he worked for 24 or 48 hours straight. (6-ER-981–984) The OU disputes Markel's testimony and takes the position that they fully paid Markel for all hours worked and that the OU does not know whether Markel worked the extra hours he claims. (5-ER-821). But the OU does NOT now argue, and has NEVER argued, that whether or how much to pay Markel involved a religious decision by the OU.

Markel's second claim is that Appellees, both the OU and Rabinowitz, defrauded Markel by making deliberately false statement that he would become a salaried employee making more money in order to induce Markel not to take a different job. (6-ER-985–989) . The OU disputes this claim as well, claiming only that *business decisions* were made which prevented Markel from being made

16

a salaried employee. (6-ER-985). Crucially, the OU does not claim any religious issue with making people employees and admit that they have many employees. (1-ER-118:7–119:5; 6-ER-920). Moreover, the OU has never claimed or adduced evidence that their refusal to make Markel a salaried employee was a religious decision or had anything to do with religion. (2-ER-110 - email considering making Markel a salaried employee based upon his prior earnings).

The OU filed for, and obtained the granting of summary judgment exclusively based upon the Ministerial Exception. (6-ER-955–958; 1:ER4–29). OU's argument to the District Court was that under the Ministerial Exception OU should not be bound by any minimum wage laws and is therefore not obligated to pay Markel anything because the OU claims to be a religious institution and claims that Markel is a minister. (6-ER-949:11-20). Again, these facts are disputed by Markel. Markel was not a minister, or anything akin to a minister. (4-ER-492–94 ¶¶4-12, 14, 17-18; 4-ER-497–501 ¶¶24-39)

Appellant Markel claims Appellee OU is not a religious institution and is instead a business. To support this claim, Plaintiff offers substantial evidence:

1. OU's CFO's own testimony in support of their successful $10 Million PPP application that the OU is "most aptly" described as a Food Service Contractor, not a Religious Entity (5-ER-702¶3; See 4-ER-661–663 for NAICS

17

classification of Food Service Contractor);

2.  OU's filings in other Federal Cases that kosher certification is not a religious act (4-ER-450–452 ¶¶14-16; 4-ER-375);

3. OU's admission that Kosher Certification is only for food and that the OU's Kosher Certification trademark is a marketing tool for products, including many which are unrelated to food, including jewelry cleaning machines, floor sealer, jeweler's gloves,  garage and floor cleaner, chandelier cleaner, laundry detergent, whiteout, and other non-food items. (4-ER–497, 506–513; 4-ER-497¶25; 5-ER-784:16–785:105; 4-ER-553¶32).  Indeed, the OU's testimony is that "OU is, aside from a [kosher] symbol, it is also a marketing symbol." (4-ER641–643; 5-ER-784:16–785:105).

4.  The OU's testimony that its business pitch to potential clients is that the OU trademark is a marketing tool. (4-ER641–643; 5-ER-784:16–785:105)

5. The OU's statements to the State of New York that it generates over $120 million in revenue annually and pays its top employees high six figure salaries (4-ER-550) and has an annual operating budget of $135 million (4-ER-564);

6.  OU's deposition testimony that it does not provide subsidize kosher certification and instead is paid top dollar to license their trademark because "it's not good business to subsidize kosher certification" 4-ER-587:3-7;

18

7.  The OU will not provide kosher certification to food which it admits is kosher unless it is payed a large fee and frequently sues for payment for use of their trademark. (4-ER-532; 4-ER545)

8.  Appellees also compete against other for profit non-religious entities for the same clients and business of kosher certification. (4-ER-503¶51).

Appellees disputed *all* of these facts in the their motion for summary judgment.  Appellees' position is that the OU is a religious institution based upon its original charter, some of the charities to which it donates, and its argument that kosher certification in food production is a religious act (3-ER-346; 5-ER-695; 5-ER-715).

### A.  Markel Is Not a Minister

All parties agree that Appellant Markel was not and is not a Rabbi, (4-ER-492¶¶5-7; 4-ER-605:8-15; 5-ER-817:6-8)  that Markel was not receiving any training from the OU, was not participating in any sort of seminary or religious ordination program, (4-ER-499–501¶33-39) and that the OU does not even offer any such ordination programs.  (2-ER-86:23–87:7).

Markel's testimony is that there was no interview or screening process to ensure that he, or the other kosher supervisors, "followed the Torah" in their daily

lives or were knowledgeable about the kosher laws or technical requirements. (4-ER-498¶27). Appellees dispute this and say that they did require kosher supervisors to follow the Torah in their daily lives. (3-ER-269 Fact 19).

Markel, as well as a floor supervisor at Delano who did not work for the OU, testified that he was never a teacher, preacher, or "ambassador of the Jewish people", and never preached any form of religion or taught anyone anything about religion on behalf of the OU or anyone else. (4-ER-500¶¶35-37, 4-ER-488¶¶9-10; 4-ER-489¶13). Markel further testified the OU never asked him to engage in any education, teaching, or preaching of any kind and that he was never told anything of the sort.  (4-ER-492; 4-ER-499–500) Markel never represented the OU, Jews or Judaism in any formal setting, never gave speeches or presentations on behalf of the OU, and never received religious training from the OU. (4-ER-492; 4-ER-499–500).  Third party non-Jewish shift supervisors at the factory where Markel worked also testified that Markel never taught or preached Judaism to anyone at the factory and never acted in any representative capacity on behalf of the OU or Judaism. (4-ER-488¶¶9-10; 4-ER-489¶13).

Defendants partially dispute this and claim that **in general**, they sometimes want kosher supervisor's to be "ambassadors of the Jewish people" but they never stated Markel was such an "ambassador" or that they ever told Markel to act as an

ambassador. (3-ER-273.) Plaintiff disputes that the OU has any ability or authority to represent "the Jewish People" or appoint "ambassadors" and contends this off the cuff statement at a deposition is contradicted by the OU's actual statements to kosher supervisors wherein the OU never stated Markel was to be a representative to the outside world. (4-ER-499–500¶¶33-35.)

Plaintiff contends that his job did not involve any religious duties. (4-ER-502¶46 ["I was engaged in secular work in an industrial manufacturing plant, not in a synagogue, school, or any other such religious institution:"]; 4-ER-499¶31). Plaintiff was responsible for factory work, including sanitizing large drums, signing bills of lading, crushing grapes, moving hoses, reconstituting juice concentrate, sealing drums and vats. (4-ER-488–489¶8; 4-ER-502¶46) This work was food services work, not religious work (4-ER-488–489¶8.) Third parties who worked at the plant also confirm that Markel's duties were identical to the duties of the non-Jewish factory workers, with the only distinction being that Markel was an employee of the OU and the other workers were employed by Delano. (4-ER-488–489¶8.) The OU disputes this and argues generally that the OU's kosher supervision and certification is purely a religious act and somehow different from the other factory workers doing the same job creating the same product. 3-ER-273–274. Notably, the OU does not discuss what specific acts carried out by

21

Markel were religious in nature.  Indeed, the OU's evidence doesn't describe anything about what Markel's daily work life involved because it was mundane, non-religious acts.

Markel never led any prayers, never received ordination, never taught any classes, and never took any classes or received any education from the OU  (4-ER–488-489; 4-ER-500–501).

Markel was never a teacher, was never charged with explaining any part of Judaism, or interpreting Judaism. *Id.* Instead, he would get a checklist from the OU of policies which must be followed, like a checklist for Organic food or nut-free food, and events which could not occur and had to follow that list to the letter. 4-ER-489¶10; 4-ER-492–493¶¶9-14; 4-ER-498 ¶¶30. If a question arose, Markel would have to receive further instructions from the OU, he had no authority to make his own decision and no discretion to deviate from the OU checklist.  *Id.* OU disputes these facts.

Ultimately, Markel resigned from his position at the OU in March 2018.  (4-ER-502¶45; 4-ER-644–645) and timely filed his complaint on September 27, 2019. (6-ER-981).  Appellees do not dispute either of these two facts.  (2-ER-149:15-19; 6-ER-961).

These are the material facts which must be considered and adjudicated in

22

order to resolve whether the Ministerial Exception acts as a total bar to Markel's claims. But facts evidence cannot be weighed at summary judgment. Because Markel and the OU submitted conflicting evidence on nearly every material point, it was impossible to resolve these issues without weighing the evidence. Therefore, the Motion for Summary Judgment should have been denied and the matter sent to trial.

## II. THE HISTORY OF THE MINISTERIAL EXCEPTION DEMONSTRATES IT WAS NOT INTENDED TO APPLY TO MARKEL'S CASE. MARKEL IS NOT SUING FOR DISCRIMINATION OR WRONGFUL TERMINATION AND IS INSTEAD FOCUSED ON MONEY APPELLEES AGREED TO PAY HIM AND WHICH THEY DID NOT PAY BECAUSE THEY DISPUTE THE NUMBER OF HOURS MARKEL WORKED.

The "Ministerial Exception" does not act as a bar to every single wrong committed by a religious institution against its employee. Instead, it applies on a case by case basis as a narrow affirmative defense. Moreover, the exception is rationally limited to prevent government regulation of those disputes between a

religious institution and its minister employee which impact the religious institution's training, hiring, firing, or retention of those ministers who might pervert their doctrine in some way.

> "The independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in what we have termed 'matters of church government.' [citation omitted]. **This does not mean that religious institutions enjoy a general immunity from secular laws**, but it does protect their autonomy **with respect to _internal management decisions that are essential to the institution's central mission_**. And **a component of this autonomy is the selection of the individuals who play certain key roles**. The "ministerial exception" was based on this insight. Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions . . . **But it is instructive to consider why a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities. Without that power, a wayward minister's preaching, teaching, and counseling could**

24

> **contradict the church's tenets and lead the congregation away**
>
> **from the faith**. **The ministerial exception was recognized to**
>
> **preserve a church's independent authority *in such matters*.**"

*Our Lady of Guadalupe School v. Morrissey-Berru* (2020) 140 S.Ct. 2049,

2060–2061 (emphasis added).

Therefore, unless the religious organization's authority or autonomy in

matters of selection, supervision, education, disciplining or firing of a minister are

impacted, the Ministerial Exception does not apply.

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S.

171 (2012) discussed the historical background and reasoning behind the

recognition of the Ministerial Exception, focusing exclusively on the autonomy of

religious institutions to choose their religious leaders. The choice and

management of religious leaders is protected so that the religious institution can

control the way its religion is preached, taught and interpreted. The Ministerial

Exception is then applied to prevent the government from dictating the path of a

religion's future:

> "Both Religion Clauses bar the government from interfering with the
>
> decision of a religious group **to fire one of its ministers**.
>
> Controversy between church and state **over religious offices** is hardly

25

new. In 1215, the issue was addressed in the very first clause of
Magna Carta. . . Seeking to escape the control of the national church,
the Puritans fled to New England, *where they hoped to **elect** their own
ministers* and establish their own modes of worship. . . Colonists in
the South, in contrast, brought the Church of England with them. But
even they sometimes chafed at the control exercised by the Crown
and its representatives ***over religious offices***. . . Controversies over
***the selection of ministers*** also arose in other Colonies with Anglican
establishments. . . **It was against this background that the First
Amendment was adopted. Familiar with life under the established
Church of England, the founding generation sought to foreclose
the possibility of a national church.** . . . By forbidding the
"establishment of religion" and guaranteeing the "free exercise
thereof," the **Religion Clauses ensured that the new Federal
Government**— unlike the English Crown— **would have no role *in
filling ecclesiastical offices***. The Establishment Clause prevents the
Government from appointing ministers, and the Free Exercise Clause
prevents it from interfering with the freedom of religious groups to
select their own."

26

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S. 171, 182-184 (2012) (emphasis added).

> "**The exception instead ensures that the authority to select and control who will minister to the faithful**--a matter 'strictly ecclesiastical,' . . . is the church's alone."

*Hosanna-Tabor* at pp. 194-195, fn.omitted (Bold added).

> "Confronting the issue under the Constitution for the first time in *Kedroff*, the Court recognized that the '[**f]reedom to *select* the clergy**, where no improper methods of choice are proven,' is 'part of the free exercise of religion' protected by the First Amendment against government interference."

*Hosanna-Tabor* at 186 (emphasis added) citing *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952).

*Hosanna-Tabor* made clear **the issue protected by the Ministerial Exception was a religious organization's freedom to select (or fire) its ministers**:

> "Until today, we have not had occasion to consider whether **this freedom of a religious organization *to select its ministers*** is

27

implicated by a suit alleging discrimination in employment. . . . **the Courts of Appeals have uniformly recognized the existence of a "ministerial exception,"** grounded in the First Amendment, **that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers**. **We agree that there is such a ministerial exception**. The members of a religious group put their faith in the hands of their ministers. **Requiring a church to *accept or retain* an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision.** Such action interferes with the *internal governance of the church*, depriving the church of control over the selection of those who will personify its beliefs. ***By imposing an unwanted minister*, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the *power to determine which individuals will minister to the faithful* also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions**."

*Hosanna-Tabor* at 188–89 (emphasis added).

28

Given the Supreme Court's lengthy discussion of the underlying basis for the recognition of the Ministerial Exception as an outgrowth of the First Amendment's Religion Clauses, the application of the Ministerial Exception is clear. **The Ministerial Exception acts as an affirmative defense only where the claim presented is one which impacts a religious institution's ability to select, hire, fire, or discipline its ministers or where the governmental regulation seeking to be enforced by the employee interferes with a** *religious decision* **by the religious institution**.

Appellant's claims, which focus on fraud and Appellees' *agreement* to pay Markel for work he performed are not claims which trigger the application of the Ministerial Exception. (6-ER-981–992) This is particularly true since the evidence here shows **the OU expressly agreed to pay Markel for overtime hours he worked, and indeed did pay him on occasion for working overtime hours**. (2-ER-128; 2-ER-119-124).

The OU has identified no religious or doctrinal objection to paying Markel for overtime hours, and paying him at an increased rate. Instead, the dispute is over whether or not Markel worked the hours he claims. 2-ER-107.

Moreover, "**the [ministerial] exception also applies more narrowly only to** *employment discrimination claims* **asserted by a** <u>minister</u>." *Tucker v. Faith*

29

*Bible Chapel Int'l,* 36 F.4th 1021, 1029 (10th Cir. 2022) (emphasis added).

Importantly, Appellant's claims do not arise from or require an adjudication of discrimination or wrongful termination by the Appellees. (See Complaint: 6-ER-981-992) Indeed, all parties testified that Markel resigned from his work at the OU and was not fired or terminated by the OU:

"Q: . . . [Markel's] resignation was voluntary in March of 2018. Is that your understanding?

A. [By Rabinowitz] Yes."

(2-ER-149:15-19) (See also Markel Declaration 4-ER-502¶45; Markel's Resignation Letter 4-ER-644–645; Appellees' Answer admitting Markel resigned 6-ER-961)

Appellant's claim does not trigger the application of the Ministerial Exception defense **because Appellees presented no evidence and did not even argue that the amount they paid Markel or the number of hours they asked him to work or whether overtime should be paid had any basis in religion** or in a religious decision. (2-ER-47:3-11)

Stated differently, there was no religious decision by Appellees which factored into how many hours Markel might work in a day. Similarly, Appellees do not claim they made a religious decision as to how much money they would

30

pay Markel for an hour of work. Finally, Appellees adduced no evidence and *never even argued* that a religious decision of any kind precludes compliance with California minimum wage laws or the payment of overtime hours to Markel.

**Instead, the evidence shows agreements by the OU to pay Markel higher overtime rates for overtime hours he worked while employed by the OU.** (2-ER-128; 2-ER-119-124). Markel alleges Appellees failed to make those payments for hours he worked.

The common thread in all of the decisions applying the Ministerial Exception to civil suits is a plaintiff who seeks a judicial decision which would impact the religious institution's ability to select, hire, fire, discipline, or train its ministers. But Appellant's claims do not fit into this category. The issues which are to be adjudicated in Markel's case do NOT involve any religious decision or question and therefore the Courts are free to adjudicate all of Markel's claims.

In order to resolve Appellants' claims the Court need only determine (1) whether Plaintiff worked the hours he claimed to have worked; (2) whether the Appellees agreed or was obligated by law to pay for overtime work; (3) whether Markel was paid at all, or paid the correct amount, for those hours. The Ministerial Exception does not apply to Appellant's case.

31

**A. The Ministerial Exception Has Been Applied In Cases Involving the Hiring, Firing, Disciplining or Training of A Minister, Not In the Context Of How Much An Employee Should Be Paid For Hours Worked. The District Court Committed Prejudicial Error In Expanding the Ministerial Exception to Appellant's Case.**

While the Ministerial Exception has been applied to claims which involve religious decisions by an employer, the District Court here recognized that **there has never been a case which expanded the Ministerial Exception to the facts alleged herein by Appellant**:

> ""THE COURT: . . . And I'm right that there's no Supreme Court or Ninth Circuit authority directly on point for these circumstances; correct? I mean, we talked about *Morrissey-Berru*, et cetera, but there's nothing directly on point."

(2-ER-76:20–77:10).

Yet the District Court felt constrained by Appellees' Counsel argument that *Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288 required the expansion of the Ministerial Exception to *all* employment claims. *Id.* But that has never been the law.

*Hosanna-Tabor* involved a suit against an Evangelical Lutheran Church and

32

School brought by their employee Perich (an admitted commissioned minister) who "taught a religion class four days a week, led the students in prayer and devotional exercises each day, and attended a weekly school-wide chapel service. Perich led the chapel service herself about twice a year." *Id.* at 178. Perich was later fired when she threatened to sue. *Id.* at 178. Perich sued, alleging discriminatory and retaliatory termination based upon her disability and threat to sue. **The church responded that "she had been fired for a religious reason**." *Id.* at 180 (bold added). **The Court applied the Ministerial Exception because the case involved "a church's selection of its ministers"** and "concerns government interference with an internal church decision that affects the faith and mission of the church itself" *Id.* at 190.

*Morrissey-Berru,* similarly involved two teachers who taught religion at a "Roman Catholic primary school in the Archdiocese of Los Angeles" where each plaintiff "took religious education courses at the school's request," "was expected to attend faculty prayer services," stated in writing their mission was "to develop and promote a Catholic School Faith Community," was "responsible for the faith formation of the students in their charge each day," "was required to teach religion for 200 minutes each week" and prayed with students and testified that each tried to teach "catholic values" *Morrissey-Berru* at 2056-2057, 2059.

33

**Both *Morrissey-Berru* teachers filed *wrongful termination claims* and the employer alleged that the employee teacher was fired for failing to teach the religious curriculum in conformity with church doctrine**. *Id.* at 2059. The Court applied the Ministerial Exception because "when a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 2069.

Therefore, the claims in *Morrissey-Berru* clearly implicated the application of a church doctrine and religious decision to the church's retention, hiring or firing of certain employees who were ministers.

Here, is it undisputed that Appellant Markel resigned and was not fired (2-ER-149:15-19; 4-ER-502¶45; 4-ER-644–645; 6-ER-961) and that Appellant's claims do not sound in "wrongful termination" or "discrimination. (Complaint: 6-ER-981-992)  Moreover, Appellee OU is not a teacher or school and does not even offer ordination. (2-ER-86:23–87:7). Appellant is not a rabbi (4-ER-492¶¶5-7; 4-ER-605:8-15; 5-ER-817:6-8) and never did any teaching of any kind, never took any classes from the OU to obtain ordination because the OU does not offer ordination (2-ER-86:23–87:7), and did not interpret or preach a religion on behalf

34

of the OU. (4-ER-488¶¶9-10; 4-ER-489¶13; 4-ER-492 ¶¶4-7; 4-ER-499–500 ¶¶33-38)  Instead, **Markel's claims are akin to a breach of contract claim** since the issue presented in Appellant's Complaint (6-ER-981-992) is whether the OU agreed to pay for Markel's work and then did not.

Markel's claims do not implicate an internal religious decision affecting the faith and mission of a religious institution.  Nor have Appellees ever identified a religious issue or decision which might be at play here. Therefore, the Court does not need to wade into religious doctrine or religious decisions and is left to decided whether Markel worked the hours he claimed, and whether the OU paid him properly for the additional hours he worked.

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 308 (4th Cir. 2004) preceded *Hosanna-Tabor* and *Morrissey-Berru* and is no longer controlling law.  However, even in that case the employee claimed to be a member of the clergy, was vested with substantial discretion to make religious decisions, was selected, prequalified, and disciplined by a Rabbinical Assembly in order to work at the *Hebrew Home* whose entire goal was to provide a Jewish religious life to the Jewish residents *who resided at the home*, including daily prayer conducted by a Rabbi, community education, and meals which complied with Jewish dietary restrictions.  *Shaliehsabou v. Hebrew Home* at 301. **Hebrew**

**Home essentially operated as a live-in synagogue** and its employee's core function was to create and enhance the Jewish religious experience of his employer's residents and therefore the Ministerial Exception applied. Moreover, unlike this case, *Hebrew Home* did not involve any evidence that the employer had agreed to pay the employee overtime and had paid overtime to the employee in the past. Here, Markel does present such evidence. (2-ER-128; 2-ER-119-124).

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), superceded by *Hosanna-Tabor* and *Morrissey-Berru*, also involved an admitted minister who underwent two years of religious training and oversaw the execution of the Salvation Army's religious projects. *Id* at 554-555. All parties agreed the employer was a religion and the employee was a minister engaged in religious activity. *Id*. at 556. The minister was then fired and sued alleging ***wrongful termination based upon her gender***. *Id* at 555. The Circuit Court, dismissed her suit because her claims "cause the State to intrude upon matters of church administration and government" *Id*. at 560. Moreover, *McClure's* prayer for monetary recovery was inextricably linked to the religious decisions of the employer, requiring the Court to compare the plaintiff's salary to the salary of male ministers to determine whether she was subjected to gender discrimination.

By contrast, Markel's claims do not involve discrimination claims and do

36

not require a comparison to others, just an analysis of the hours worked and the rate to be applied to those hours. (6-ER-981-992). Moreover, Appellees have never claimed or argued that the amount paid to Appellant involved a religious decision.

In granting summary judgment and applying the Ministerial Exception to Appellant's claims, the District Court made new law, and expanded the Ministerial Exception far beyond its current form and in a way which contradicts the historical context of its creation. The trial in this matter need only answer whether Appellant worked the hours he claims, whether the OU agreed or was obligated to pay him for those hours (they admit they paid Markel some overtime and therefore concede they are obligated to pay him for the hours worked) and whether Markel was paid (he was not). None of these decisions implicate the autonomy of a religious institution and the Ministerial Exception is inapplicable.

### III.  EVEN ASSUMING APPELLANT WAS A MINISTER AND APPELLEES QUALIFIED AS A RELIGIOUS ORGANIZATION, THIS COURT COULD STILL REVERSE AND ORDER A TRIAL BECAUSE THE DISPUTED QUESTIONS WHICH REQUIRE RESOLUTION ARE AKIN TO A BREACH OF CONTRACT AND DO NOT TOUCH UPON RELIGION OR A RELIGIOUS DECISION.

The Supreme Court in both *Hosanna-Tabor* and *Morrissey-Berru* recognized that where a religious organization has a dispute with a minister which **does not** touch upon a religious decision or religious issue, the Ministerial Exception does not apply and the Court is free to adjudicate the merits of the claim:

> "**The case before us is an employment discrimination suit** brought on behalf of a minister, challenging her church's decision to fire her. **Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers**."

*Hosanna-Tabor* at 196 (bold added).

38

Similarly:

**"[The ministerial exception] does not mean that religious**

**institutions enjoy a general immunity from secular laws**, but it

does protect their autonomy **with respect to *internal management***

***decisions that are essential to the institution's central mission*** ."

*Morrissey-Berru* at 870 (emphasis added).

Additional substantial Ninth Circuit precedent makes clear that the only

claims to which the Ministerial Exception automatically applies are claims that

impinge on a church's ability to choose or select its ministers. See *Werft v. Desert*

*Sw. Annual Conference of the United Methodist Church*, 377 F.3d 1099, 1100, fn.

1 (9th Cir. 2004) (**Ministerial Exception applies to statutes impinging on**

**church's "prerogative to choose its ministers"**); See also *Elvig v. Calvin*

*Presbyterian Church*, 397 F.3d 790, 792 (9th Cir. 2005) concurring opinion

("[t]he First Amendment does not exempt religious institutions from all statutes

that regulate employment.")

Indeed, there are many scenarios where the Ministerial Exception will not

apply so long as the Court is able to fully reach the merits of the claim without

ever having to adjudicate religious decisions.

By way of example, the California Court of Appeals in *Sumner v. Simpson*

*Univ.*, 27 Cal. App. 5th 577, 592 (2018) held that even when an employee is a minister of a religious institution dedicated to religious education, the employee's claims for breach of contract based upon wrongful termination were not barred by the Ministerial Exception because:

> "Reviewing Sumner's contract cause of action will not require the court to wade into doctrinal waters because **review of the breach of contract claim does not require a review of Sumner's religious qualification or performance as a religious leader**. **Defendants have never claimed to have terminated Sumner** *for religious reasons*,"

*Sumner v. Simpson Univ.*, 27 Cal. App. 5th 577, 593–94 (2018) (emphasis added) citing *Minker v. Baltimore Ann. Conf. of United Methodist Church*, 894 F.2d 1354, 1359 (D.C. Cir. 1990) (holding that an oral employment contract between a minister and a church could be adjudicated by the Court: "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court.")

The Court in *Sumner* reasoned that because the employer had never claimed to have terminated or breached the contract *for religious reasons* the Ministerial Exception did not bar the claim by the employee. The Court in *Sumner* was able

40

to hear evidence of the terms of the agreement and evaluate the conduct of the parties without ever having to *adjudicate* a *religious decision*, and therefore the Ministerial Exception was inapplicable.

*Sumner* is similar to the instant facts in that Appellant resigned and was not fired. (2-ER-149:15-19; 4-ER-502¶45; 4-ER-644–645; 6-ER-961) Markel's claim is NOT for any sort of wrongful termination. (6-ER-981-992). Instead, Markel's claims parallel a breach of contract in that he claims (1) Appellees agreed to pay him for overtime; (2) Markel worked overtime; and (3) Markel was not paid for that overtime. (6-ER-981-992). Markel also adduced evidence, including Appellees' own testimony and emails, admitting that they had agreed to pay Markel overtime and did pay Markel overtime on a number of occasions. (2-ER-128; 2-ER-119-124).

Importantly, Appellees never claimed to have failed to pay Markel "for religious reasons." *Instead*, **Appellees' position is that they dispute whether Markel actually worked the hours he claims and what the rate should be for those additional hours if they were worked.** (5-ER-821; 6-ER-962).

Therefore, when evaluating Markel's case, the Court does not need to explore or adjudicate any religious issue, religious doctrine or religious decision of Appellant or Appellees. The Court can freely take up and fully explore and

adjudicate the issues of whether Markel worked the hours claimed and how much more Markel should have been paid for the time he worked without ever touching upon religion.

For this reason, even if the Appellees are a religious entity and even if Appellant is a minister, the Ministerial Exception does not bar the adjudication of any of Appellant's causes of action.

**A. The Ministerial Exception Does Not Apply. Applying The Minimum Wage Laws to This Case Would Not Violate Either of the Religion Clauses of the First Amendment Because None of the OU's Decisions Regarding Payments to Markel's Were Related to Religion And There Is No Claim That Appellee's Religion Conflicts With the California Minimum Wage or Overtime Laws.**

The Ministerial Exception is an outgrowth of the Free Exercise and Establishment Clauses of the First Amendment. Neither clause supports the application of the Ministerial Exception here.

"To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria. First, the claimant's proffered belief must be sincerely held . . . Second, 'the

42

claim must be rooted in religious belief, not in "purely secular"

philosophical concerns.' [citations omitted] Determining whether a

claim is 'rooted in religious belief' requires analyzing whether the

plaintiff's claim is related to his sincerely held religious belief."

*Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), supplemented, 65 F.3d 148 (9th

Cir. 1995).

But Appellees have never argued or submitted evidence to link the

application of California Minimum Wage Laws to any religious decision or belief

by Appellees, **because Appellees do NOT contend that the amount of hours**

**worked or the pay rate for Markel are keyed to any religious decision or**

**belief**.

Appellees fair no better under the test for Establishment Clause claims:

"Under the test developed in *Lemon v. Kurtzman*, government action

survives an Establishment Clause challenge if (1) it has 'a secular

legislative purpose,' (2) its 'principal or primary' effect 'neither

advances nor inhibits religion,' and (3) it does 'not foster an

excessive government entanglement with religion.' *Lemon v.*

*Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2125, 29 L.Ed.2d 745

(1971) (internal quotations omitted) (emphasis added)"

43

*Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 287 (D. Me. 2020).

Again, California's Minimum Wage laws pass this test and Appellees fail to identify any religious entanglement which would be occur by an obligation to pay Markel for the hours he worked or to pay Markel overtime or double time for his 24 and 48 hour shifts because Appellees do not contend that any religious belief or decision was involved in determining the amount of hours or the rate of pay for Markel.

Appellees included declarations and testimony from a number of Rabbis, but nowhere does any evidence link Appellees' decisions regarding payment to Markel or the hours worked by Markel or California's minimum wage laws to any religious decision. The failure of Appellees to demonstrate that the claims in this case must involve the adjudication of a religious decision by Appellees is fatal to the applicability of the Ministerial Exception.

**B. The Evidence Shows That the OU Routinely Paid Overtime to Markel and People In Markel's Position. Requiring the OU to Comply with California Overtime Law Does Not Impact Any Religious Decision by the OU.**

The record in this matter is replete with examples of Appellees agreeing to pay overtime, and indeed actually paying overtime to Markel and other people

44

who held Markel's position in California.

Elon Winkler, an OU employee, sent an email from his OU email account "winklere@ou.org" on behalf of the OU stating the OU would pay overtime for Markel's work:

> "SO THAT THERE IS NO MISUNDERSTANDINGS . . . $25 PER
>
> HOUR $37.50 OVERTIME PAY AFTER 8 HOURS"

(2-ER-128)

Markel replied:

> "Elon, Consider me confirmed."

(2-ER-128)

Similarly, Appellee Rabinowitz testified as PMQ for the OU (2-ER-89-90) that the OU paid overtime to Markel and has a general practice of paying overtime. (2-ER-119-124). **Rabinowitz never indicated that the decision regarding whether to pay overtime was a religious decision**. Instead, Rabinowitz's testimony was that the fact of working overtime, or time beyond what had been initially agreed to, obligated the OU to pay overtime, and indeed the OU then did pay that overtime amount to the employees:

> "Q: Okay. Does the OU ever pay overtime for kosher supervisors? . . .
>
> A: [by Rabinowitz as PMQ for the OU]:  The OU occasionally does pay

45

overtime. . . .

Q:  Within California, does the OU ever pay overtime?

A: By agreement, where there is such an agreement in place, then the OU sometimes does pay overtime, correct. . . . **When a person -- if the agreement is to pay them for that number of hours and the person has gone overtime, so then that person receives a -- an overtime payment.**

Q: Did you ever agree to pay Yaakov Markel any overtime amount?

A: There were occasions where Mr. Markel had to work beyond his general scope, and he did receive bonuses for those extra hours that he worked. . . .

Q:  Okay. Were there instances where Mr. Markel worked beyond the 12 hours which was initially agreed or requested by the OU?

A: I can't remember specifically, but where he described that -- as an example, if he was supposed to partner with another individual to provide 24 hour coverage or, you know, the -- the other individual didn't show up and he needed to put in some extra hours of coverage, so then, when -- when asked, we -- you know, we provided bonuses for that additional work."

(2-ER-120:7–124:19).

The OU has therefore agreed to pay Markel for overtime and indeed paid

46

Markel overtime for some of his time worked. The OU never made any sort of "religious decision" regarding the overtime rate or the decision not to pay overtime to Markel. As a result, the District Court erred in finding it could not adjudicate whether Markel was to be paid overtime because there is no religious decision or issue claimed by the OU as to the payment of overtime. Moreover, the OU's agreement to pay overtime allows the Court to adjudicate whether or not overtime or other payments are owed to Mr. Markel as Courts can always adjudicate agreements.

# IV. *ALCAZAR V. CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE* INVOLVED DIFFERENT FACTS AND DOES NOT SUPPORT THE EXPANSION OF THE MINISTERIAL EXCEPTION TO THE INSTANT CASE WHERE NO RELIGIOUS TRAINING OR ORDINATION WAS INVOLVED AND THE APPELLEE IS SIMPLY AN EMPLOYEE WORKING HOURLY FOR PAY.

After nearly an hour of oral argument, the District Court indicated that it did not believe there was any Supreme Court or Ninth Circuit precedent which required the application of the Ministerial Exception to Markel's claims. Appellees then argued "We would say *Alcazar* is the Ninth Circuit authority on point regarding the wage claims." (2-ER-76:22-77:10). Appellees relied primarily on *Alcazar* to argue before the District Court that simply being a church exempts them from ALL employment regulations, including the obligation to actually pay their employees and the obligation to pay overtime and doubletime as required by California law. The Court's decision then relied upon *Alcazar* in granting summary judgment. (1-ER-27–28). The District Court reasoned that *Alcazar* barred all relief for *any* employment action based upon nonpayment. *Id.*

But *Alcazar* is limited by its express language and cannot and should not be stretched to include Markel's claims.

48

In *Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288 this Court limited its holding to applying the Ministerial Exception in cases where a complaint seeks the adjudication of whether or how much a *priest in training* was to be paid by the church for work that was performed *as part of his seminary training to become a priest* involved religion and implicated the "ministerial exception." *Alcazar* at 1290-1292. *Alcazar* noted that the Ministerial Exception **exempts churches from "some," but not all, employment statutes**. *Alcazar* at 1290. Both the facts and language of *Alcazar* demonstrate it is inapplicable to Markel.

*Alcazar* involved a case where plaintiff Rosas entered the seminary of the defendant "'to become a catholic priest and performed his duties in a ministerial placement,' '[a]s part of [his] preparation for ordination into the priesthood,'" *Alcazar* at 1290.

Alcazar alleged he was entitled to additional payment while he was engaged in his schooling and seminary process to become an ordained Catholic priest based upon certain work he did which the church claimed was training. In that context, the Ninth Circuit determined that the amount to be paid to a priest in training by the church training him for ordination involved a religious issue and implicated the "ministerial exception." *Alcazar* at 1290-1292.

49

Contrary to Defendants' argument, *Alcazar*'s language limits the decision:
"**Our holding today is limited**. . . . we agree with the courts that have
held that, if a church labels a person a religious official as a mere
'subterfuge' to avoid statutory obligations, the ministerial exception
does not apply**. .** Similarly, **the ministerial exception may not apply
to a seminarian who obtains employment with a church outside
the scope of his seminary training**. Here, **Rosas challenges the
church's wages for his duties** *as a seminarian*. As part of his
seminary training, he alleges, he was placed at St. Mary Parish where
he performed duties such as maintenance and assisting with mass.
Fairly read, **Rosas' complaint alleges that he performed those
duties** *as part of his seminary training*."

*Alcazar* at 1292 (emphasis added).

Here, the OU concedes that Markel was not a seminarian and was not
engaged in any sort of educational or seminary training as part of an attempt to
obtain ordination **because the OU admits it doesn't even offer a seminary
program** (often called an ordination program in the rabbinic context) (2-ER-
86:23–87:7). The OU also failed to adduce ANY evidence that it was running a
school or religion training program, and that is their burden. Instead, **because no**

50

**seminary training ever took place** *all of Markel's work* **took place outside of the scope of any "seminary training"**, thereby removing it from the analysis applied in *Alcazar*. Markel is not, and was never an ordained Rabbi, or Rabbi in training, and the extent of his Jewish education was completing some of ninth grade at a Jewish high school a decade before he was hired by the OU. (4-ER-492¶¶5-7; 4-ER-605:8-15; 5-ER-817:6-8)

*Alcazar* stands for the principle that when a minister undergoes training by the church, requiring the church to justify why it does or does not pay its trainees for portions of their religious training impermissibly involves the government in religious doctrinal matters and thus is a prime example of the application of the Ministerial Exception.

This Court's reasoning in *Alcazar* recalls the training in the movie Karate Kid, where the work of "wax on wax off" was more than just applying polish to a car and was a means to teach martial arts. In *Alcazar* this Court's concern was that some of Alcazar's labor for the church was designed as religious training to teach a larger religious lesson. *Alcazar* reasoned the Court should not involve itself in adjudicating the legitimacy of the church's decision to designate only part of a seminarian trainee's time as compensable.

But here, there was never any religious training of Markel toward any type

51

of ordination. (2-ER-86:23–87:7). The OU hired Markel, a non-rabbi, to further

their business interest of making more money licensing their trademark. Markel

was never part of an OU seminary or training program, and **the OU admitted it**

**does not even offer an ordination or seminary program**. (2-ER-86:23–87:7).

The OU never required Markel to engage in any acts to further any training as a

minister because the OU does not offer such a program (2-ER-86:23–87:7) and

therefore Markel was not being trained as a minister and was working as an

employee doing a job unrelated to education or training.

Markel's complaint here does not even tangentially touch upon a church's

independence on matters of faith or doctrine because no evidence shows that the

hourly rate paid (or in this case not paid) to employees of the OU or the

requirement to comply with California minimum wage laws is somehow a

religious or doctrinal issue. Similarly, Markel's allegations are unrelated to the

OU's power to "select, supervise and if necessary remove" an OU employee

"without interference by secular authorities" because Markel resigned from the

OU (2-ER-149:15-19; 4-ER-502¶45; 4-ER-644–645; 6-ER-961) and none of his

claims relate to a wrongful discharge or improper supervision or control of

Plaintiff. (6-ER-981-992). Here, Plaintiff alleges that for portions of the time

worked, he was **never paid even though the OU had paid him overtime in the**

**past.** (6-ER-981-992).

**Appellees' evidence and argument fails to *attempt* to show that religion played any role in the amount of Plaintiff's pay or in the OU's decision about whether Plaintiff should be paid for certain hours worked.  Instead, the evidence shows that amounts of payments are a business decision** based upon the income generated from the client paying the OU.  (4-ER-637–638).  *Alcazar* is therefore inapplicable to the instant facts.

**A.  The First Amendment Does Not Bar Employment Claims, Including Minimum Wage Claims.**

"The First Amendment does not exempt religious institutions from all statutes that regulate employment. For **example, the First Amendment does not exempt religious institutions from laws that regulate the minimum wage** or the use of child labor, even though both involve employment relationships."

*Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 792 (9th Cir. 2005) (concurrence) (bold added).

Similarly, in *Tony & Susan Alamo Found. v. Sec'y of Lab*., 471 U.S. 290, 291–92 (1985) the United States Supreme Court held that the minimum wage, and

overtime requirements of the Fair Labor Standards Act, applied to "workers engaged in the commercial activities of a religious foundation, regardless of whether those workers consider themselves 'employees.'"

The Supreme Court in *Tony & Susan* also rejected the argument that the application of a minimum wage law to a religious entity would somehow violate the Religion Clauses of the First Amendment:

> "Petitioners . . . argue that imposition of the minimum wage and record keeping requirements will violate [the Religion Clauses of the First Amendment] . . . **Neither of these contentions has merit**. It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights."

*Tony & Susan* at 303 (footnote omitted, bold added).

The Supreme Court made this finding *despite the fact* that the employer claimed that the amount paid to their workers was actually a religious decision.

In fact, the only claims to which the Ministerial Exception automatically applies are claims that impinge on a church's ability to choose or select its ministers. See *Werft, supra*; see also *Bollard v. Cal. Province of the Soc'y of Jesus,*

*196 F.3d 940, 947* (9th Cir. 1999) (*selection* of clergy beyond judicial review).

This Court and the Supreme Court have reviewed the claims of ministers on a case-by-case basis, and balanced the rights involved under the First Amendment before applying the Ministerial Exception.

In this case, even if Markel was a minister and the OU was a religious organization the Ministerial Exception should not be applied to the claims presented.

However, as discussed below Markel is not a minister and the OU is a business not a religious organization.

## V. THE OU IS NOT A RELIGIOUS INSTITUTION AND IS INSTEAD A BUSINESS LICENSING ITS TRADEMARK FOR A FEE.

Defendant OU argues that it is a religious institution, which is a prerequisite to the application of the Ministerial Exception. (5-ER-939). However, this fact is disputed by the OU's own prior statements as well as other substantial evidence.

**The OU's primary business, where it devotes the majority of its resources, and which generates nearly all of the OU's income is the licensing of the OU's trademark in exchange for a fee.** (4-ER-606-607; 4-ER-554-556).

The OU admits it is part of a **$12 billion** a year industry of kosher

55

certification and trademark licensing for a fee (4-ER-628:15-25). OU generates $120 million annually from its business (4-ER-550) and has an annual operating budget of $135 million (4-ER-564). In order to do this, **the OU competes against many other for profit kosher certification entities for the same clients**. 4-ER-503¶51.

OU argues it is providing a community service to some Jews by making sure that kosher food is certified as such. This fact is disputed. The OU is not providing a community service, and in fact refuses to cut into its substantial profits to subsidize its expensive trademark licensing fee. OU testified they **must turn a profit and "it's not good business to subsidize kosher certification" and so OU doesn't do it.** 4-ER-587:3-7.

Similarly, the OU sues in Federal Court anytime their trademark is used without the OU receiving a fee, even if the OU agrees the food is kosher. 4-ER-532, 4-ER-544; 4-ER-501¶42. In one such suit, the OU stated "the OU 'simply cannot permit ... use [of] the OU mark ... without paying for the service. ... **The Orthodox Union cannot provide [kosher] certification services gratuitously** '" 4-ER-532, 4-ER-544; 4-ER-501¶42.

The OU is a business because its primary purpose and business is the licensing of its mark for kosher certification, something which the OU has told

other Courts is not a religious act, making their status as a "religious institution" a disputed fact. This conduct also calls into question and renders disputed the propriety of the OU's status as a non-profit.

**A.  The OU Has Stated in Other District Courts That Its Business of Kosher Certification "Is Not Religious Exercise."**

The OU has conceded in other filings that the act of kosher certification and supervision is NOT a religious act. The OU stated in its filing before the Eastern District Court of New York that kosher food production and labeling "is not a religious exercise," (4-ER-450¶13, 4-ER-475).

Contrary to the OU's argument here that the OU symbol is somehow religious because it relates to kosher food **the OU told the Federal Court previously that**:

> "**Kosher food, in and of itself, has no religious significance**" and "Food that is 'kosher' is merely food that is fit or proper for consumption according to Jewish dietary laws. **That certain foods are designated as 'kosher' does not signify or imply that they have received a special blessing**."

(4-ER-450-451¶¶14-16, 4-ER-475).

The OU continued:

**"'kashruth' describe[s] the physical characteristics of foods** . . .

**the dietary standards are** absolutely clear, entirely undisputed, and

**remarkably mundane**. . . **In no event does the determination**

**depend on any spiritual factor. It is solely a question of the food's**

**physical attributes"**

( 4-ER-450-451¶¶13-16, 4-ER-472-473 bold added).  This position contradicts the

OU's current motion.

During a deposition in the above case, the OU's testimony compared its

kosher certification to a certification that a product is "dairy free" or "nut free".

(4-ER-451--452¶¶16-17; 4-ER-486)

The OU made similar statements to Markel, stating that OU's kosher

certification "is no more demanding and does not have any higher standards or

more difficulty than certifying food as "organic" or "non-GMO" or "Vegan" or

"sugar-free" or "Keto Approved" or "Whole30 approved" or "Atkins Approved" or

"gluten free" or "whole grain" or "fat-free."" (4-ER-498-499¶30). The same level

of diligence is required to simply check off the list of approved items and practices

and make sure that nothing from the non-approved list is included in the

manufacturing of the food products.  *Id*.  Therefore, the OU is not a religious

institution because it admits its business is not a religious exercise.

**B. The OU Received $10 Million of Federal PPP Loan Forgiveness by Representing to the SBA that the OU Was "Most Aptly" Classified as a Food Service Contractor Not A Religious Organization.**

The North American Industry Classification System (NAICS) created labels for entities self-classify itself into the most appropriate category. The NAICS system is used for all sorts of Federal programs, including the SBA. The OU applied for and received a $10 million loan from the SBA's PPP program during the COVID-19 pandemic. The application (5-ER-697-713) was attested to by the OU's CFO Mr. Schwartz. (5-ER-694-695).

In the OU's $10,000,000 PPP application OU stated that potentially two different NAICS codes might apply, either NAICS Code 722310 for "Food Service Contractors" or Code 813110 for "Religious Organizations." (See 4-ER-661–663 for NAICS descriptions of each category). However, **the OU explained that the OU is "most aptly" categorized as a "Food Service Contractors" meaning the OU is NOT most aptly categorized as a "Religious Organization"** (5-ER-702¶3).

Moreover, the OU admits that other than kosher certification, the OU does

not engage in any other food services business. (4-ER-602:18-603:2).

Unsurprisingly, the examples provided by the NAICS of other "Food Service Contractors" are for profit businesses without religious activities such as "Airline food service contractors, Food concession contractors (e.g., at sporting, entertainment, convention facilities)" ( 4-ER-661). The OU should be bound by their representations that they are a Food Service Contractor, which netted them $10 million from the Federal Government.

### C. Appellees' Testimony in this Case Tacitly Admitted That the OU's Kosher Certification Is Not a Religious Act By Contrasting Kosher Certification With Acts Which the OU Believes Qualify As Religious Acts.

Defendant testified that the OU pays no heed to the actual meaning of the honorific term "Rabbi" and uses it as internal slang for many of the men who work at the OU, even though the OU knows they are not Rabbis. 4-ER-588:13-591:3.

Defendant was then asked whether the OU's clients (like Delano) care about whether or not a kosher supervisor is a Rabbi, Defendant responded:

"A. I don't know. I don't really care.

Q. And why don't you care?

A. **Because it's irrelevant to Delano**. If Delano is looking for

60

kosher certification.  They're not looking for -- **if [clients] wanted a rabbi they would look up a rabbi for a local synagogue. They're not coming to us because they want to convert to Judaism. They're not coming to us because they want someone to perform marriage.  They're coming to us because they want kosher certification"**

4-ER-591:22-592:13 (bold added)

Implicit in this statement is the admission that kosher certification is not a religious act.  It is not comparable to a Rabbi's duties, to a synagogue event, to a conversion to Judaism, or to the religious act of officiating a marriage.  Even in the OU's own eyes, kosher certification is separate and distinct from a religious act.  At a minimum, the OU's own statements in this case indicate it is disputed that the OU is engaged in religion.   Therefore, Markel was not engaged in any religious act and is not a minister.

**D.  The OU Licenses Their Trademark As A Marketing Tool To Be Put On All Sorts of Inedible Items and Poisons For Which They Admit Kosher Certification Is Not Required.**

Contrary to the OU's claim that it is engaged in religious work, the OU

61

admits that it sells its services and trademarks as a marketing tool, not a religious

tool. (4-ER--641–643). OU services and trademark are used for marketing

purposes by other businesses to generate more business, not as a religious symbol.

(4-ER-497**). Moreover, the OU's business pitch to its clients is that the OU's

symbol is a marketing tool**. (4-ER-641:21-643:10).

Similarly, even though OU admits kosher certification is only required for

food, the OU receives a fee to provide kosher certification to inedible items

including gloves, floor sealer, jeweler's gloves,  garage and floor cleaner, jewelry

cleaning machines, chandelier cleaner, laundry detergent, whiteout, and other

non-food items. (4-ER–497, 506–513; 4-ER-497¶25; 5-ER-784:16–785:105; 4-

ER-553¶32).

This is a business not a religious act.


**E. Appellees Incorrectly Relied Upon *Conlon*, and *Schmoll.***

Appellees argued that because their charter from 1898 mentions Judaism

that they must, in 2023 be considered a religious organization.  OU relied upon

*Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) for

this argument. *Conlon* is unavailing.

In *Conlon* the defendant was a religious organization because it was

62

"undisputed" that Intervarsity was "a Christian organization, whose purpose is to advance the understanding and practice of Christianity *in colleges and universities*." *Conlon* at 833–34 (emphasis added). *Conlon's* reasoning is consistent with *Morrissey-Berru*'s reasoning that *"*Religious education is vital to many faiths practiced in the United States" *Id.* at 2064. But here, the OU does not fit within *Conlon* because its goal is not religious education. Instead, as discussed above, kosher certification and trademark licensing is the primary business and generates the the majority of OU's revenue. (4-ER-657-658; 4-ER-554). The fact intensive analysis required by the Supreme Court precludes reliance upon *Conlon* with its different facts.

*Schmoll v. Chapman Univ*., 70 Cal. App. 4th 1434, 1436 (1999) like *Conlon* held that an institution devoted to religious education at the university level qualified as a religious institution. *Schmoll* did not extend the Ministerial Exception to organizations like the OU, nor could it. Notably, *Schmoll* was disagreed with more recently by *Sumner, supra*, which allowed religious claims to because "**Defendants have never claimed to have terminated Sumner for religious reasons**," *Sumner* at 593–94 (emphasis added).

**Here, the Appellees never claimed their refusal to pay Markel was "for religious reasons."**

63

Additionally, while the existence of a 125 year old charter may factor into an analysis, every single case from *Hosanna-Tabor* and *Morrissey-Berru* to *Salvation Army*, *Alcazar* and *Hebrew Home* look directly at the **current** actions of the entity when evaluating whether it was a church or religious organization. The OU's current actions are all business related.

**F. Other Cases Discussing Religious Entities Show the OU is a Business.**

In *Spencer v. World Vision, Inc.*, 633 F.3d 723, 747 (9th Cir. 2011) This Court looked at the way an institution charged people as one litmus test to determine whether the entity was a religious institution:

"Looking at how an institution charges offers an objective test for sorting out which institutions are designed to exchange goods or services for money, [from those serving] a religious objective. . . **We can tell much about an institution's purpose by looking at the objective evidence of how it charges**. A religious purpose may be a motive, or money may be a motive, for work that serves others**. If money is not available as an incentive, that is strong evidence, in the purportedly religious institution, that exercise of religion is**

64

**the objective. If satisfaction of a religious purpose is insufficient**

**to motivate the performance, then the performance may be**

**consistent with religion but not motivated by it.** There is nothing

wrong with money as an incentive, but its presence or absence is

strong evidence of what the incentive is."

*Spencer* at 747. (emphasis added). As discussed above, the OU does not give

away or subsidize its services, it charges a premium for them and sues ruthlessly to

ensure it gets paid maximum dollar, further indicating the OU is not a religious

organization and therefore cannot invoke the Ministerial Exception.

## VI. MARKEL IS NOT A MINISTER

### A. The Ministerial Exception Requires a Fact Intensive Analysis and the Court Erred In Applying A Rigid Formula To Appellant.

The Ministerial Exception acts as an affirmative defense. "We conclude that

the exception operates as an affirmative defense" *Hosanna-Tabor* at 195, FN 4.

But **the application of the Ministerial Exception requires a fact intensive**

**analysis of each individual case**:

"The Supreme Court has made clear, in both *Hosanna-Tabor* and *Our*

65

*Lady***, that this threshold determination of whether an employee is a 'minister' for purposes of the 'ministerial exception' requires a fact-intensive inquiry into the specific circumstances of a given case**."

*Tucker v. Faith Bible* at 1029 (bold added).

"We declined 'to adopt a rigid formula for deciding when an employee qualifies as a minister,' . . . We identified four relevant circumstances but did not highlight any as essential." *Morrissey-Berru*, at 2062 discussing *Hosanna-Tabor* at 190.

Therefore, the rigid application of the Ministerial Exception proposed by Appellees and adopted by the District Court is incorrect. All of the factors considered by *Hosanna-Tabor* favor Plaintiff **not** being a minister and are disputed. Those factors were:

"First, Perich's church had given her the title of 'minister, with a role distinct from that of most of its members.' Second, her position 'reflected a significant degree of religious training followed by a formal process of commissioning.' Ibid. Third, she 'held herself out as a minister of the Church' and claimed certain tax benefits. Fourth, her 'job duties reflected a role in conveying the Church's message and

66

carrying out its mission.'"

*Morrissey-Berru* at 2052 citing *Hosanna-Tabor*.

Markel was never a Rabbi, had no formal title, did not have religious knowledge or training and did not receive any from the OU. (4-ER-492¶¶5-7; 4-ER-605:8-15; 5-ER-817:6-8). Markel's title was frequently changed arbitrarily by the OU, showing that the title itself had no religious meaning. (4-ER-494 ¶17). Markel never had any "significant religious training" or any "formal process of commissioning" and instead completed some of ninth grade at a Jewish high school. 4-ER-492¶7; 4-ER-500¶39 and the OU did not offer any ordination program (2-ER-86:23–87:7).

Markel never claimed to be a Rabbi and was not at all involved in teaching, preaching, or interpreting a religious message to anyone. (4-ER-488¶¶9-10; 4-ER-489¶13; 4-ER-492 ¶¶4-7; 4-ER-499–500 ¶¶33-38).

Notably, the OU used the term Rabbi with total disregard for its religious meaning, using it instead to simply indicate a man who worked at the OU, regardless of whether they were actually a Rabbi or engaged in any religious work. (4-ER-588:13-589:20; 4-ER-590:20-591:10).

Indeed, kosher supervisors were not required to be Rabbis. (4-ER-588:13-19. Moreover, the OU's kosher supervisors were not required to have any

knowledge of judaism or kosher rules: "The people who were hired by the OU [as kosher supervisors] to work at Delano and other locations had no formal Jewish education, had no rabbinical ordination, had not previously worked as a kosher supervisor, did not have any understanding of the technicalities of the kosher laws." 4-ER-500¶39.

Finally, Markel's job did not involve any role in conveying the OU's message or mission, he was a worker at a factory not interacting, teaching or preaching to anyone on behalf of the OU. (4-ER-499–500 ¶¶33-38; 4-ER-488¶¶9-10; 4-ER-489¶13). In fact, Markel never had a role interacting with the community on behalf of the OU. *Id.*

When Markel carried out things like washing vats, the OU dictated the temparature of the water based upon "the science of boiling points and temperatrues for the heating of metals." He was even told by the OU that an OU employee was not required to participate in the cleaning or koshering of the tanks. 4-ER-499¶31.

Markel similarly had no discretion at all to make decisions regarding OU policy. Instead, he followed the rules set by the OU. *Id.* Markel also did not create OU policy or have discretion to modify OU rules (4-ER-492¶¶10-12; 4-ER-493¶¶14-15; 4-ER-494¶¶16, 18; 4-ER-495¶20; 4-ER-496¶21). The OU also

conceded that non-Jewish people do many parts of Markel's job and told that to Markel. (4-ER-498¶29).

The OU is not a religious entity and even if it is, Plaintiff is not a minister under any test or set of facts.

At a minimum, when applying the summary judgment standard of viewing evidence in a light most favorable to Appellant, the facts which underlie any determination on this issue **are disputed and must be resolved at trial.**

## VII.  MARKEL'S CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION ARE NOT DEFEATED BY THE MINISTERIAL EXCEPTION.

The Ministerial Exception does not apply to fraud claims see *Petruska v. Gannon Univ*., 462 F.3d 294, 310 (3d Cir. 2006) (declined to follow for other reasons in *Alcazar, supra*.)

Here, Markel's third cause of action is for fraud against both Rabinowitz and OU.  (4-ER-985-990) The fraud alleged involved Appellee's deliberate and wilful misrepresentations that if Markel agreed not to quit and continued to do certain work, then Appellees would make Markel a salaried employee at a higher level of income.  *Id.*  In truth, Appellees never even considered making Markel a

69

salaried employee, and but for their material misrepresentations to Markel, Markel would have accepted a different job.

Again, Appellees have not keyed the decision regarding whether or not to make Markel a salaried employee to any religious decision or belief. Indeed, Appellees concede that they have other salaried employees doing the same work. (2-ER-118).

The District Court incorrectly concluded that the Fraud claims against both Appellees are were barred by the Ministerial Exception because "Markel's claims under the California Labor Code underly his entire Complaint, and all of the employment-related decisions by the OU implicated in each claim are barred by the 'ministerial exception'" 1-ER-29. But is it disputed that any "employment-related decision" was ever made here. The Ministerial Exception is inapplicable to Markel's fraud claims.

**CONCLUSION**

For the foregoing reasons Appellant requests the judgment of the District Court be reversed in its entirety and the matter remanded for trial. This Court should find that (1) the Ministerial Exception does not apply to the claims brought by Markel because they can be adjudicated without adjudicating any religious

70

issue; (2) the material facts underlying the affirmative defense are disputed and summary judgment was therefore improperly granted; (3) Appellees have not met their burden on summary judgment to show it is undispute that Appellees are a religious organization or that Appellant is a minister, and therefore the Ministerial Exception cannot be invoked by Appellees in the instant litigation.

Appellant should be given his opportunity to present his evidence at trial. The District Court's judgment and dismissal should be reversed in full.

DATED: July 17, 2023                    Friedman² LLP

                                        _s/ Michael E. Friedman_____
                                        Steven R. Friedman
                                        Michael E. Friedman
                                        Attorneys for Plaintiff-Appellant
                                        Yaakov Markel

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-55088

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Michael E. Friedman    **Date** | July 17, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55088

I am the attorney or self-represented party.

**This brief contains** | 13,988 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⊙ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Michael E. Friedman | **Date** | July 17, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*