**No. 23-55088**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

YAAKOV MARKEL,

*Plaintiff-Appellant*,

v.

UNION OF ORTHODOX JEWISH CONGREGATIONS OF
AMERICA and NACHUM RABINOWITZ,

*Defendants-Appellees*.

On appeal from the U.S. District Court for the Central District of California
Case No. 2:19-cv-10704-JWH-SK
The Honorable John W. Holcomb

_____

**APPELLEES' ANSWERING BRIEF**

_____

| Leonora M. Schloss (SBN 145142) | Dylan B. Carp (SBN 196846) |
|---|---|
| JACKSON LEWIS P.C. | JACKSON LEWIS P.C. |
| 725 South Figueroa Street, Suite 2500 | 50 California Street, 9th Floor |
| Los Angeles, California 90017-5408 | San Francisco, California 94111-4615 |
| Telephone: (213) 689-0404 | Telephone: (415) 394-9400 |
| Facsimile: (213) 689-0430 | Facsimile: (415) 394-9401 |
| Leonora.Schloss@jacksonlewis.com | Dylan.Carp@jacksonlewis.com |

Attorneys for Appellees

## DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, the Union of Orthodox Jewish Congregations of America certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Date: October 12, 2023              JACKSON LEWIS P.C.


By:   s/Dylan B. Carp
       Leonora M. Schloss
       Dylan B. Carp
       Attorneys for Defendants-Appellees
       UNION OF ORTHODOX JEWISH
       CONGREGATIONS OF AMERICA
       and NACHUM RABINOWITZ

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF JURISDICTION ....................................................3

III. ISSUES PRESENTED ........................................................................3

IV. PERTINENT LEGAL PROVISIONS .................................................4

V. STATEMENT OF THE CASE ..............................................................4

    A.    The Orthodox Union is a Jewish synagogue organization serving the Orthodox Jewish community. .............................................4

    B.    The Orthodox Union's kosher certification enables the Orthodox Jewish community to follow *kashruth*, essential to Orthodox Jewish belief. .....................................................................5

    C.    The Orthodox Union retains Markel as Head *Mashgiach* to ensure grape product is kosher. ........................................................7

    D.    Markel alleges the Orthodox Union wrongfully retained him as an independent contractor and misrepresented that it would hire him to a salaried management position. .........................................10

    E.    The district court grants summary judgment based on the ministerial exception. ..............................................................11

VI. SUMMARY OF THE ARGUMENT ..................................................11

VII. STANDARD OF REVIEW ...............................................................14

VIII. ARGUMENT ...................................................................................15

    A.    The First Amendment's ministerial exception forbids courts to adjudicate employment disputes between a religious institution and its "ministers." ...............................................................................15

    B.    The district court correctly held that Markel was the Orthodox Union's "minister." ..............................................................15

1. Judaism has many "ministers." ................................................15

2. *Shaliehsabou* held that *mashgiachim* are "ministers," like those with religious musical duties. ..................................................19

3. The district court correctly relied on the Colpa Amici Brief and *Shaliehsabou*. ..........................................................................24

4. The district court correctly relied on *kashruth's* centrality to Orthodox Jewish belief. .........................................................27

5. The district court correctly applied *Hosanna-Tabor*. ...............30

6. Markel's scattered and repetitive contentions lack merit. ........32

C. The district court correctly held that the Orthodox Union is a religious institution. ...........................................................................................39

1. The district court's reasoning is correct...................................39

2. Markel's scattered and repetitive contentions lack merit. ........42

D. The district court correctly held that Markel's claims are barred.......49

1. The ministerial exception encompasses all tangible employment actions including hiring and compensation decisions. .............49

2. Because Markel challenges only tangible employment actions, his claims are barred. ..............................................................53

3. Markel's scattered and repetitive contentions lack merit. ........55

E. Markel waived any appeal of Rabinowitz's judgment........................64

IX. CONCLUSION..............................................................................................64

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alcazar v. Corp. of Cath. Archbishop*,
  598 F.3d 668 (9th Cir. 2010) ........................................................*passim*

*Alcazar v. Corp. of Cath. Archbishop*,
  627 F.3d 1288 (9th Cir. 2010) (en banc) .......................................*passim*

*Bollard v. California Province of the Soc'y of Jesus*,
  196 F.3d 940 (9th Cir. 1999) ........................................................*passim*

*Cannata v. Catholic Diocese of Austin*,
  700 F.3d 169 (5th Cir. 2012) .......................................................24, 38

*Conlon v. Intervarsity Christian Fellowship/USA*,
  777 F.3d 829 (6th Cir. 2015) .............................................................64

*EEOC v. Kamehameha Sch./Bishop Est.*,
  990 F.2d 458 (9th Cir. 1993) .......................................................41, 48

*EEOC v. Roman Cath. Diocese of Raleigh, N.C.*,
  213 F.3d 795 (4th Cir. 2000) .......................................................23, 38

*EEOC v. Townley Eng'g & Mfg. Co.*,
  859 F.2d 610 (9th Cir. 1988) .......................................................40, 41

*Elvig v. Calvin Presbyterian Church*,
  375 F.3d 951 (9th Cir. 2004) ........................................................*passim*

*Emp. Div. v. Smith*,
  494 U.S. 872 (1990).........................................................................61

*Garcia v. Salvation Army*,
  918 F.3d 997 (9th Cir. 2019) ........................................................*passim*

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
  882 F.3d 655 (7th Cir. 2018) .......................................................29, 38

iv

*Hawn v. Exec. Jet Mgmt.*,
  615 F.3d 1151 (9th Cir. 2010) ............................................................14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012).................................................................*passim*

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
  503 F.3d 217 (3d Cir. 2007) ...............................................................41

*United States ex rel. Kelly v. Serco, Inc.*,
  846 F.3d 325 (9th Cir. 2017) ..............................................................64

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020)............................................................*passim*

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006) ........................................................61, 62

*Prince v. Massachusetts*,
  321 U.S. 158 (1944).............................................................................61

*Ross Island Sand & Gravel v. Matson*,
  226 F.3d 1015 (9th Cir. 2000) ............................................................59

*Schleicher v. Salvation Army*,
  518 F.3d 472 (7th Cir. 2008) ..............................................................54

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
  363 F.3d 299 (4th Cir. 2004) ....................................................*passim*

*Spencer v. World Vision, Inc.*,
  633 F.3d 723 (9th Cir. 2011) ...................................................*passim*

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
  41 F.4th 931 (7th Cir. 2022) ........................................................62, 63

*Starkman v. Evans*,
  198 F.3d 172 (5th Cir. 1999) .............................................16, 23, 38

*Sterlinski v. Catholic Bishop of Chi.*,
  934 F.3d 568 (7th Cir. 2019) ......................................................24, 38

v

*Tony and Susan Alamo Foundation v. Sec'y of Labor*,
    471 U.S. 290 (1985) ................................................................61

*Tucker v. Faith Bible Chapel Int'l*,
    36 F.4th 1021 (10th Cir. 2022) ...............................................56

*Velasquez-Gaspar v. Barr*,
    976 F.3d 1062 (9th Cir. 2020) ....................................24, 27, 40, 46

*Wasco Prods. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006) ..................................................58

*Werft v. Desert Southwest Ann. Conf.*,
    377 F.3d 1099 (9th Cir. 2004) (per curiam) ........................50, 58, 59

**California Cases**

*Higgins v. Maher*,
    210 Cal. App. 3d 1168 (1989) .................................................64

*Schmoll v. Chapman Univ.*,
    70 Cal. App. 4th 1434 (1999) .................................................59

*Sumner v. Simpson Univ.*,
    27 Cal. App. 5th 577 (2018) ...............................................58, 59

**Federal Statutes**

26 U.S.C.
    § 501(c)(3) ...........................................................4, 13, 41

42 U.S.C.
    § 2000e-1(a) ..................................................................39

Civil Rights Act of 1964, Title VII........................................13, 20, 39, 50

Fair Labor Standards Act ...............................................19, 20, 54

Washington's Minimum Wage Act ..........................................51

vi

**California Statutes**

Cal. Bus. & Prof. Code
   § 17200.................................................................................10

Cal. Labor Code ........................................................2, 10, 13, 14, 53
   § 226......................................................................................11
   § 1194(a) ...............................................................................10
   § 510......................................................................................10

**Other Authorities**

Colpa Amici Brief .............................................................*passim*

Establishment Clause .............................................................62

Free Exercise Clause ..........................................................*passim*

Gerald F. Masoudi, *Kosher Food Regulation and the Religion Clauses
of the First Amendment*, 60 U. Chi. L. Rev. 667 (1993) ....................27

North American Industry Classification System
   Code 722310 ....................................................................42, 43
   Code 813110 ........................................................................42

Rabbi Hayim Halevy Donin, *To Be a Jew: A Guide to Jewish
Observance in Contemporary Life* 29 (1972)...........................20, 21

*Random House Webster's Unabridged Dictionary* 1181 (2d ed. 1998)..................20

U.S. Const., amend. I .........................................................*passim*

vii

## I.     INTRODUCTION

Defendant-Appellee Union of Orthodox Jewish Congregations of America

("Orthodox Union") is a not-for-profit corporation organized in 1898 "to uphold

and strengthen the observance of orthodox Judaism."  Because a central tenet of

Orthodox Jewish belief is to eat only kosher food, one important way the Orthodox

Union fulfills its mission is by certifying food as kosher.  As the Fourth Circuit

explained, "Jews view their dietary laws as divine commandments, and compliance

therewith is as important to the spiritual well-being of its adherents as music and

song are to the mission of the Catholic church."  *Shaliehsabou v. Hebrew Home of*

*Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Cir. 2004).  Plaintiff-Appellant

Yaakov Markel's absurd contention that obeying the kosher laws is not central to

Orthodox Jewish religious belief is false, resting on statements in unrelated

litigation over New York's kosher fraud laws taken completely out of their context.

In that litigation, the Orthodox Union said only that New York's kosher fraud laws

do not violate the free exercise of religion because the plaintiffs were prohibited

solely from falsely advertising non-kosher products as kosher, they were not

prohibited from choosing whether to keep kosher.

To fulfill its religious mission to the Orthodox Jewish community, the

Orthodox Union retained Markel as a *mashgiach*, "an inspector appointed by a

board of Orthodox rabbis to guard against any violation of the Jewish dietary

laws." *Shaliehsabou*, 363 F.3d at 301 (quotation marks omitted).  Markel sued the Orthodox Union, claiming that it wrongfully retained him as an independent contractor so it owed him "unpaid doubletime" under the California Labor Code, and that it misrepresented that it would "hire him to a salaried management position including a raise commensurate with the promotion."  The district court granted summary judgment to the Orthodox Union on the ground Markel's claims are barred by the First Amendment's "ministerial exception."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).  This Court should affirm.

As the Head *Mashgiach* at two wineries, Markel was the Orthodox Union's "minister" because he used his religious training and knowledge to ensure the grape product met kosher requirements, carrying out the Orthodox Union's mission of enabling Orthodox Jews to observe kosher laws central to their faith.  As *Shaliehsabou* explained, because keeping kosher is a divine commandment, "failure to apply the ministerial exception in this case would denigrate the importance of keeping kosher to Orthodox Judaism."  363 F.3d at 309.

The Orthodox Union is a religious institution protected by the ministerial exception.   It holds itself out as a religious institution, providing education and advocacy programs to the Orthodox and larger Jewish community.  Its kosher food

///

2

certifications enable religiously devout Jews to keep kosher and provide revenue to fund its other religious programs.

The ministerial exception bars Markel's claims. "The ministerial exception encompasses all tangible employment actions and disallows lawsuits for damages based on lost or reduced pay." *Alcazar v. Corp. of Cath. Archbishop*, 598 F.3d 668, 674 (9th Cir. 2010) ("*Alcazar I*"), adopted as relevant on rehearing en banc, 627 F.3d 1288 (9th Cir. 2010) (en banc) ("*Alcazar II*") (quotation marks omitted). Markel challenges only the Orthodox Union's tangible employment actions in retaining him as an independent contractor and paying him agreed compensation. And because Markel challenges only such tangible employment actions, the ministerial exception "similarly precludes [him] from seeking *remedies* that implicate those decisions." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 966 (9th Cir. 2004) (emphasis in original).

Accordingly, the district court properly dismissed his lawsuit.

## II.    STATEMENT OF JURISDICTION

Defendants agree with Markel's statement of jurisdiction.

## III.    ISSUES PRESENTED

1.     Did the district court correctly hold that Markel was the Orthodox Union's "minister"?

///

3

2.      Did the district court correctly hold that the Orthodox Union is a religious institution?

3.      Did the district court correctly hold that Markel's claims are barred by the ministerial exception?

## IV.    PERTINENT LEGAL PROVISIONS

Pertinent legal provisions are set forth in an Addendum bound with this brief.

## V.    STATEMENT OF THE CASE

### A.    The Orthodox Union is a Jewish synagogue organization serving the Orthodox Jewish community.

The Orthodox Union is an Orthodox Jewish synagogue organization representing several hundred congregations across the United States.  (3-ER-206; 5-ER-687; 5-ER-717; 5-ER-694).  It is devoted to promoting traditional, or Orthodox, Judaism worldwide.  (5-ER-717; 5-ER-694).  It is organized as a 26 U.S.C. § 501(c)(3) not-for-profit corporation (3-ER-207; 5-ER-718; 5-ER-695; 5-ER-760–64; 5-ER-758), and it receives donations from individuals, foundations, and synagogues.  (3-ER-210; 5-ER-718; 5-ER-695).  It is a religious institution whose mission is to serve the Orthodox Jewish Community, whose religious observance is based on performance of religious activities and rituals in nearly every facet of everyday life.  (3-ER-212; 5-ER-687; 5-ER-717; 5-ER-758).

To fulfill its mission to engage, strengthen, and lead the Orthodox Jewish

community and inspire the greater Jewish community, the Orthodox Union provides many services and programs. (3-ER-222; 5-ER-687; 5-ER-717). These include religious advocacy and religious study programs, religious youth programs, and kosher food certification. (3-ER-224; 5-ER-687; 5-ER-717–18; 5-ER-694; 5-ER-782–83). One of its primary services is ensuring the wide availability of kosher foods by acting as a leading national certifier of kosher food products. (3-ER-226; 5-ER-687; 5-ER-718).

Defendant Rabbi Nachum Rabinowitz was the Orthodox Union's Senior Rabbinic Coordinator during all relevant times. (3-ER-315; 5-ER-905–06; 5-ER-828–33; 5-ER-687).

### B. The Orthodox Union's kosher certification enables the Orthodox Jewish community to follow *kashruth*, essential to Orthodox Jewish belief.

The essence of Orthodox Judaism is conducting one's life in accordance with *halacha*[1], the millennia-old body of Jewish law that governs how Jews should pray, eat, dress, conduct business, care for themselves and others, and carry out innumerable other activities of daily life, big and small. (3-ER-231; 5-ER-688; 5-ER-718). For Orthodox Jews, *halacha's* comprehensive regulation of everyday

---

[1] Many of the Hebrew and Yiddish words in this brief have multiple English spellings.

life makes the performance of all manner of seemingly secular activities a matter of religious obligation and practice.  (3-ER-235; 5-ER-688; 5-ER-718).  For both Orthodox Jews and Orthodox Jewish institutions, complying with *halachic* rules within the realm of secular law is as much a religious obligation as complying with rules governing prayer and rituals.  (3-ER-240; 5-ER-688; 5-ER-718).

One of the important rituals that the Orthodox Jewish follow is the observance of *kashruth* (keeping kosher), the body of Jewish religious laws on the suitability of food and the fitness for use of ritual objects.  (3-ER-245; 5-ER-688; 5-ER-718; 3-ER-285; 5-ER-903).  The Orthodox Union provides kosher certifications verifying that a product's ingredients, production facility, and production derivatives, tools, and machinery meet kosher standards.  (3-ER-249; 3-ER-257; 5-ER-688–89; 5-ER-719).  Its kosher certified symbol "Ⓤ" assures consumers that both the certified product and its production adhere to all kosher law requirements.  (3-ER-251; 5-ER-688; 5-ER-719).  The Orthodox Union markets its kosher certifications to producers, allowing those producers to label their products with the Orthodox Union's symbol indicating that the goods are kosher.  (3-ER-251; 5-ER-688; 5-ER-719).  Its Kosher Division earns income through its kosher certification process, which it uses to finance its other Divisions' religious activities supporting the Orthodox Jewish community.  (3-ER-339; 5-ER-719; 5-ER-790; 5-ER-694).

6

### C. The Orthodox Union retains Markel as Head *Mashgiach* to ensure grape product is kosher.

"*Mashgiach*" is the Hebrew term for a supervisor of *kashruth*. (3-ER-282; 5-ER-982). The Orthodox Union certifies grape products and wine as kosher and retains *mashgiachim* (plural of *mashgiach*), who must be verified Sabbath-observing Jews with basic knowledge of the concepts of Jewish laws pertaining to winemaking, to oversee the *kashruth* of grape products. (3-ER-252; 5-ER-688). For grape products, including the grape juice concentrate at issue in this case, and wine to be considered kosher, the production must be restricted to handling and manipulation exclusively by Sabbath-observing Jews during certain periods. (3-ER-253; 5-ER-688–89; 5-ER-798).

To become a *mashgiach*, one must be Jewish, *shomer Shabbat* (Sabbath-observant), *shomer mitzvot* (Torah-observant), and *shomer kashrut* (personally fulfilling the laws of *kashrut*). (3-ER-269; 5-ER-689). The Orthodox Union views *mashgiachim* as ambassadors of the Jewish people who provide a religious function. (3-ER-273; 5-ER-689; 4-ER-440–41). Markel confirmed this understanding, explaining to *mashgiachim* under his supervision, "[r]emember that we represent the Jewish community and I hope our time here will leave the Delano workers with a sense of respect for Jewish people and our culture." (5-ER-773). *Mashgiachim* must be knowledgeable about Jewish law (3-ER-277–78; 5-ER-689),

7

and they perform a social and technical role in explaining kosher rules to the Jewish and non-Jewish communities and in forging close relationships with employees and customers. (3-ER-277–78; 5-ER-689; 4-ER-440–41).

Before the Orthodox Union retained Markel as a *mashgiach*, Markel was required to submit a letter from an Orthodox rabbi certifying that he was a Sabbath observer who was trustworthy and fit to carry out the Orthodox Union's religious mission. (3-ER-295; 5-ER-689; 5-ER-855; 5-ER-901; 3-ER-297). Markel refers to himself as a *Frum* (religiously devoted) Jew. (3-ER-300; 5-ER-845; 5-ER-769). He was raised in an Orthodox Jewish home in which his father ran a kosher supervision agency. (3-ER-299; 5-ER-881–82). Markel attended Jewish Day school where he also learned about keeping kosher. (3-ER-301; 5-ER-891). Prior to his work with the Orthodox Union, Markel was employed for more than ten years as a *mashgiach* with a different kosher agency (3-ER-303; 5-ER-895–99), and also worked as a *mashgiach* at his father's kosher supervision agency for years. (3-ER-304; 5-ER-881–84; 5-ER-848–51).

Markel served as a "Head *Mashgiach*" for the Orthodox Union from the summer of 2011 to March 18, 2018. (3-ER-290; 5-ER-900–01; 5-ER-834–35; 5-ER-759; 3-ER-282; 6-ER-982). He oversaw the kosher production of grape products at Delano Growers Grape Products ("Delano") and San Joaquin Valley Concentrates ("Gallo"). (3-ER-284; 6-ER-982). Markel wrote the job description

8

for *mashgiachim* performing *hashgacha* (rabbinic supervision by a *mashgiach*) and provided detailed instructions for the koshering of grape products at the Delano and Gallo wineries. (3-ER-292; 5-ER-767–68). That job description confirmed that "there is a head *mashgiach* on whose shoulders rests the responsibility for *kashrus*" at the winery. (5-ER-767–68).

Markel would consult *poskim* (experts) who assisted him with his duties as a *mashgiach*, and he would report *halachic* issues (issues pertaining to Jewish law) to Rabbi Rabinowitz and others. (3-ER-311; 5-ER-759; 5-ER-834–37; 3-ER-315; 5-ER-905–06; 5-ER-828–33). As Head *Mashgiach*, Markel would request *Piskei Dinim* (Rabbinical rulings on Jewish law) for assistance with issues or operations. (3-ER-311; 5-ER-835–57).

Markel was also responsible for supervising workers, providing them with instructions on how to maintain kosher standards. (3-ER-319; 5-ER-907–08). Markel would make determinations regarding whether the grape product was *meshuval* (cooked or boiled) at which point a non-Jew could handle the product without impairing its kosher status. (3-ER-323; 5-ER-900; 5-ER-897–98; 3-ER-294; 5-ER-772). He was responsible for only the products to be certified as kosher. (3-ER-261–62; 5-ER-795–97). Factory workers handled non-kosher items that were also processed at the facility. After a non-kosher run, Markel had to oversee special cleaning of the equipment to ensure the kosher integrity of grape

9

product.  (3-ER-266–67; 4-ER-441–42; 4-ER-445).  Markel trained others on

procedures for koshering tanks by cleaning them to kosher specifications, and he

was generally responsible for implementing Orthodox Union policies and for

kosher integrity at the Delano winery.  (3-ER-325; 5-ER-908–11; 3-ER-327; 5-ER-

913–14; 3-ER-330; 5-ER-921–23).  Markel explained to Delano the importance of

maintaining seals on grape products in his absence so that the "Kosher integrity has

been maintained."  (3-ER-307; 5-ER-765–66).

> ### D. Markel alleges the Orthodox Union wrongfully retained him as an independent contractor and misrepresented that it would hire him to a salaried management position.

Markel sued the Orthodox Union and Rabinowitz, alleging that the Orthodox

Union "misclassif[ied] [Markel] as an independent contractor" instead of an

employee.  (6-ER-984–85).  He pled five claims.  In his first claim, he sued for

"approximately $568,000 for unpaid doubletime" under Cal. Labor Code

§§ 1194(a) and 510 (6-ER-983), which mandate "overtime" for "employee[s]" at

"one and one-half times the regular rate of pay" and "twice the regular rate of pay"

in some cases.

In his second, he alleged unfair business practices under Cal. Bus. & Prof.

Code § 17200 due to "defendants' failure to pay earned wages in the form of

overtime under the California Labor Code."  (6-ER-984).  In his fifth, he alleged

that the Orthodox Union failed to provide him accurate itemized wage statements

10

under Cal. Labor Code § 226, which requires such statements for "employee[s]." (6-ER-991).

In his third for "fraud and deceit," he alleged that the Orthodox Union intentionally misrepresented that it would "hire him to a salaried management position including a raise commensurate with the promotion." (6-ER-985). In his fourth for "negligent misrepresentation," he alleged that the Orthodox Union made the same misrepresentation negligently. (6-ER-990–91).

### E. The district court grants summary judgment based on the ministerial exception.

The district court granted summary judgment to the Orthodox Union and Rabinowitz on the ground Markel's claims are barred by the ministerial exception. (1-ER-4–30). The District Court's reasoning is discussed below.

## VI. SUMMARY OF THE ARGUMENT

The district court correctly held that Markel was the Orthodox Union's "minister." "Judaism has many 'ministers,'" *Morrissey-Berru*, 140 S. Ct. at 2064, including "kosher-food supervisors." (*Morrissey-Berru*, Brief for Colpa et al. as *Amici Curiae* 3-4 ("Colpa Amici Brief")). In a persuasive opinion, the Fourth Circuit held a *mashgiach* was a "minister" under analogous circumstances, recognizing that "failure to apply the ministerial exception in this case would denigrate the importance of keeping kosher to Orthodox Judaism." *Shaliehsabou*,

11

363 F.3d at 309. Moreover, all four considerations in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 191-92 (2012), favor Markel's "ministerial" status: to obtain his position as "Head *Mashgiach*" he had to submit a letter from an Orthodox Rabbi certifying that he was a Sabbath observer who was trustworthy and fit to carry out the Orthodox Union's religious mission. His duties were to apply Jewish rules of *kashruth* for food production according to religious regulations, reflecting the Orthodox Union's religious mission and the importance of supervising the kosher production of grape products for the Orthodox Jewish faith. Markel was assisted by *poskim* on *halachic* issues at the wineries, he requested *Piskei Dinim* for assistance with issues there, he provided detailed instructions regarding the koshering of grape products, and he supervised and instructed workers on how to maintain kosher standards, applying the tenants of the Jewish faith to his work. Markel's contention that in unrelated litigation the Orthodox Union stated that complying with kosher laws is not integral to Orthodox Jewish belief is a mischaracterization; rather, the Orthodox Union said only that New York's kosher fraud laws did not violate the plaintiffs' right to the free exercise of religion because they were prohibited solely from falsely advertising non-kosher products as kosher, and were not prohibited from choosing whether to observe kosher laws.

The district court correctly held that the Orthodox Union is a religious

institution. Markel does not contend that the district court erred in taking guidance from *Spencer v. World Vision, Inc.*, 633 F.3d 723, 744 (9th Cir. 2011) (O'Scannlain, J. concurring), which interpreted Title VII's religious organization exemption. The Orthodox Union is a religious institution under that persuasive precedent. It is a 26 U.S.C. § 501(c)(3) not-for-profit corporation with a mission of supporting the Orthodox Jewish faith. Its Articles of Incorporation provide that its objectives are "to uphold and strengthen the observance of orthodox Judaism." Its services include kosher food certification and production that enable religiously devout Jews to keep kosher. It holds itself out as a religious institution, providing education and advocacy programs to the larger Jewish community. Thus, the Orthodox Union is "primarily religious." *Id.* at 729 (O'Scannlain, J., concurring). Markel's contention that the Orthodox Union is not a religious institution because it charges market rates to certify products as kosher, and uses those revenues to fund its programs for the Orthodox Jewish community, is unsupported by the case law and unpersuasive.

The district court correctly held that Markel's claims are barred by the ministerial exception. That doctrine "encompasses all 'tangible employment actions,'" *Alcazar I*, 598 F.3d at 674, including decisions about "hiring," *Elvig*, 375 F.3d at 960-61, and "the determination of a minister's salary." *Alcazar I*, 598 F.3d at 674. Markel's claim for unpaid "doubletime" under the California Labor

Code is barred under *Alcazar I* and *II*, which held the ministerial exception barred a minister's state-law claim for unpaid overtime. His claims that the Orthodox Union misrepresented that it would "hire him to a salaried management position including a raise commensurate with the promotion" but then failed to do so impermissibly challenges the Orthodox Union's hiring and compensation decisions. *Elvig*, 375 F.3d at 960-61. Because Markel challenges only such tangible employment actions, the ministerial exception "similarly precludes [him] from seeking *remedies* that implicate those decisions." *Elvig*, 375 F.3d at 966 (emphasis in original). Markel's contention, repeated *ad nauseam*, that the ministerial exception does not bar his claims because the Orthodox Union has not shown that it made a "religious decision," or articulated a "religious reason" for its decisions, contradicts binding Circuit precedent that the ministerial exception bars litigation over ministerial decisions whether or not made for a religious reason. "[T]he ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions." *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 946-47 (9th Cir. 1999).

## VII. STANDARD OF REVIEW

The Court reviews the district court's summary judgment de novo. *Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010).

## VIII. ARGUMENT

### A. The First Amendment's ministerial exception forbids courts to adjudicate employment disputes between a religious institution and its "ministers."

"The First Amendment provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Morrissey-Berru*, 140 S. Ct. at 2060 (quoting *U.S. Const. amend. I*). "[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Ibid.* (quotation marks omitted). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Ibid.* "The 'ministerial exception' was based on this insight." *Ibid.* "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Ibid.*

### B. The district court correctly held that Markel was the Orthodox Union's "minister."

#### 1. Judaism has many "ministers."

The rule described above "appears to have acquired the label 'ministerial exception' because the individuals involved in pioneering cases were described as 'ministers.'" *Ibid.* But "the ministerial exception encompasses more than a

church's ordained ministers." *Alcazar II*, 627 F.3d at 1291 (citing *Starkman v. Evans*, 198 F.3d 172, 176 (5th Cir. 1999) (holding ministerial exception applies to Methodist church's choirmaster and director of music)). In particular, the Supreme Court has recognized that "Judaism has many 'ministers.'" *Morrissey-Berru*, 140 S. Ct. at 2064 & n.11 (quoting Colpa Amici Brief at i, 3).[2]

The Supreme Court's two opinions addressing the ministerial exception supply context for its observation that "Judaism has many 'ministers.'" *Hosanna-Tabor*, 565 U.S. 171; *Morrissey-Berru*, 140 S. Ct. 2049. In *Hosanna-Tabor*, Cheryl Perich, a "called" kindergarten and fourth grade teacher at an Evangelical Lutheran school, claimed that she had been discharged because of a disability. *Hosanna-Tabor*, 565 U.S. at 178-80. After the district court granted summary judgment for the defendant based on the ministerial exception, the Sixth Circuit reversed, concluding that "Perich did not qualify as a 'minister' under the exception, noting in particular that her duties as a called teacher were identical to her duties as a lay teacher." *Id*. at 181. The Supreme Court reversed, holding her suit was barred by the ministerial exception. *Id*. at 196.

The Court declined "to adopt a rigid formula for deciding when an employee

---

[2] The Orthodox Union has filed a motion for this Court to judicially notice the Colpa Amici Brief.

qualifies as a minister." *Id*. at 190. *Hosanna-Tabor* "identified four relevant circumstances but did not highlight any as essential." *Morrissey-Berru*, 140 S. Ct. at 2062. First, her church "held Perich out as a minister, with a role distinct from that of most of its members." *Hosanna-Tabor*, 565 U.S. at 191. Second, her position "reflected a significant degree of religious training followed by a formal process of commissioning." *Ibid*. Third, "Perich held herself out as a minister of the Church by accepting the formal call to religious service." *Ibid*. Finally, "Perich's job duties reflected a role in conveying the Church's message and carrying out its mission." *Id*. at 192. This was so even though "others not formally recognized as ministers by the church perform the same functions," and "her religious duties consumed only 45 minutes of each workday" and "the rest of her day was devoted to teaching secular subjects." *Id*. at 193.

   *Hosanna-Tabor* rejected the plaintiff's contention that the ministerial exception did not apply because the church's "asserted religious reason for firing Perich" was allegedly "pretextual." *Hosanna-Tabor*, 565 U.S at 194. The Supreme Court explained, "[t]he purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Id*. at 194-95 (quotation marks and citation omitted).

17

Later, in *Morrissey-Berru*, the Supreme Court affirmed summary judgment against two "lay" teachers employed by religious institutions based on the ministerial exception. 140 S. Ct. at 2056-58, 2066. The Supreme Court acknowledged that "they had less formal religious training" than the "called" teacher in *Hosanna-Tabor*. *Id*. at 2066. But the Court emphasized that "both their schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important." *Ibid*. "The schools in question here thought that [plaintiffs] had a sufficient understanding of Catholicism to teach their students, and judges have no warrant to second-guess that judgment or to impose their own credentialing requirements." *Id*. at 2068.

The Court acknowledged that "[t]heir titles did not include the term 'minister.'" *Id*. at 2066. But the Court explained that "since many religious traditions do not use the title 'minister,' it cannot be a necessary requirement." *Id*. at 2063-64. "Requiring the use of the title would constitute impermissible discrimination, and this problem cannot be solved simply by including positions that are thought to be the counterparts of a 'minister,' such as…rabbis…." *Id*. at 2064. "A brief submitted by Jewish organizations makes the point that 'Judaism has many "ministers,"' that is 'the term "minister" encompasses an extensive breadth of religious functionaries in Judaism.'" *Id*. at 2064 & n.11 (citing Colpa

18

Amici Brief i, 3).  That brief explained that "[o]bservance of traditional Judaism requires many specialists," and that "[i]n today's Jewish communities," "kosher-food supervisors" are "ministers" because they "carry out functions that are central in Jewish observance."  (Colpa Amici Brief at 3-4).

### 2. *Shaliehsabou* held that *mashgiachim* are "ministers," like those with religious musical duties.

Although *Hosanna-Tabor* was the Supreme Court's first occasion to address the ministerial exception, the Courts of Appeals "have had extensive experience with this issue."  *Hosanna-Tabor*, 565 U.S. at 188.  In the Colpa Amici Brief that *Morrissey-Berru* cited with approval, the authors explained that "kosher-food supervisors" are "ministers" based in part on the well-reasoned *Shaliehsabou*, holding the ministerial exception applies to *mashgiachim*.  Colpa Amici Brief at 15.

In *Shaliehsabou*, a *mashgiach* sued his former employer, the Hebrew Home of Greater Washington, for alleged unpaid overtime under the Fair Labor Standards Act ("FLSA").  363 F.3d at 301.  The district court granted summary judgment to the defendant based on the ministerial exception, and the Fourth

19

Circuit affirmed. *Ibid*.[3] The plaintiff was a full-time *mashgiach*, defined as "an inspector appointed by a board of Orthodox rabbis to guard against any violation of the Jewish dietary laws." *Ibid.* (quoting *Random House Webster's Unabridged Dictionary* 1181 (2d ed. 1998)). The Hebrew Home served "aged of the Jewish faith in accordance with the precepts of Jewish law and customs, including the observance of dietary laws." *Id*. at 301.

In holding the mashgiach was a "minister," the Fourth Circuit explained *mashgiachim's* religious significance to the faithful. "Consistent with its mission to serve the spiritual needs of its residents, the Hebrew Home abide[d] by the '*halakha*,'" "the overall term for Jewish law" and literally "'the way on which one goes.'" *Id*. at 301 (quoting Rabbi Hayim Halevy Donin, *To Be a Jew: A Guide to Jewish Observance in Contemporary Life* 29 (1972) ("Donin")). "In accordance with this guiding precept, the Hebrew Home provide[d] its residents kosher meals prepared in accordance with the Jewish dietary laws, which are collectively known as the '*kashruth*.'" *Id*. at 301. "As part of the *halakha*, 'the Jewish dietary laws prescribe not merely a diet for the body but a diet for the soul as well, not so much

_____

[3] The Fourth Circuit held that Shaliehsabou was a "minister" for purposes of the "ministerial exception to the FLSA," 363 F.3d at 309, which is "coextensive with that recognized under Title VII," *id*. at 307, which in turn "is based on constitutional principles." *Id*. at 306.

20

a diet to maintain one's physical well-being as a diet to maintain one's spiritual well-being.'" *Id*. at 302-03 (quoting *Donin* at 98). "The faithful Jew observes the laws of *kashruth*" "because he regards them as Divine commandments and yields his will before the will of the Divine and to the disciplines imposed by his faith." *Id*. at 303 (quoting *Donin* at 98).

"To ensure that the food services department" "would prepare kosher meals, the Hebrew Home entered into an agreement with the Rabbinical Council of Greater Washington (the Vaad)," a "non-profit organization of Orthodox Jewish congregational rabbis" that was "the primary agency of kashruth supervision" in the area, "whereby the Vaad would recommend *mashgichim* to serve in the Hebrew Home." *Id*. at 302 & n.2. "All kitchen operations including food preparation and food service, had to be taken under the supervision of the mashgiach." *Id*. at 302. "There was, however, no secular health or safety rationale for the work performed by the *mashgichim*." *Id*.

The Vaad explained that "*mashgichim* are supervisors who are qualified under Judaic law to supervise the preparation of food to ensure that it is kosher." *Id*. at 302. They "must have a knowledge of the basic laws of *kashruth* and must also be a Sabbath observer and be a fully observant Jew." *Id*. Shaliehsabou's "basic responsibility [at the Hebrew Home] was to guard against any violations of Jewish dietary law." *Id*. at 303.

21

Shaliehsabou argued that he was not a "minister" because "his primary duties involved nothing more than inspecting incoming food deliveries and ensuring the kosher preparation of food" and that "apart from being an Orthodox Jew, no special training is required to serve as a *mashgiach*." *Id*. at 308. The Fourth Circuit disagreed. The Court of Appeals reasoned that he "supervised and participated in religious ritual and worship. Shaliehsabou was responsible for starting and kosherizing the ovens and cleansing kitchen utensils in accordance with the rules of *kashruth*. He also oversaw the preparation of kosher food, a key aspect of the Jewish *halakha*." *Id*. at 309. "Indeed, according to the Hebrew Home, there is no secular purpose for employing *mashgichim*." *Id*. at 308. "Shaliehsabou arguably lacked independent authority to make some decisions regarding food preparation, but there is no requirement that an individual have the final say on spiritual matters," and "it was his responsibility to consult with the Vaad for proper resolution of any concerns." *Id*. at 309 (quotation marks omitted). "[W]e cannot say, given the importance of dietary laws to the Jewish religion, that the duties of *mashgichim* do not involve religious worship and ritual." *Id*. "In addition to performing religious ritual, Shaliehsabou occupied a position that is central to the spiritual and pastoral mission of Judaism. As a juridical religion, Judaism is dependent upon compliance with its laws, including the *kashruth*, and Shaliehsabou was the vessel through whom compliance with the *kashruth* was

22

ensured for residents at the Hebrew Home." *Id.* "Shaliehsabou, through his *mashgiach* tasks, performed sacerdotal duties." *Id.* "Jews view their dietary laws as divine commandments, and compliance therewith is as important to the spiritual well-being of its adherents as music and song are to the mission of the Catholic church. In short, failure to apply the ministerial exception in this case would denigrate the importance of keeping kosher to Orthodox Judaism." *Id.*

The Fourth Circuit's reference to "music and song" is to a prior Fourth Circuit case on which *Shaliehsabou* relied, *EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000) ("*Diocese of Raleigh*"), cited with approval in *Elvig*, 375 F.3d at 958 n.3. *Diocese of Raleigh* is part of a line of cases holding that church employees with sacred musical duties are "ministers," two of which the Ninth Circuit has cited with approval. *Diocese of Raleigh* held that a part-time music teacher and director of music ministry at a Catholic cathedral was a "minister," reasoning that the position was "important to the spiritual and pastoral mission of the church." 213 F.3d at 802 (quotation marks omitted). Music "is an integral part of many different religious traditions," and also "a vital means of expressing and celebrating those beliefs which a religious community holds most sacred." *Id.* Because the music teacher was "the primary human vessel through whom the church chose to spread its message in song," she met the ministerial exception. *Id.* at 804; *accord Starkman*, 198 F.3d at 175-77 (cited with

23

approval in *Alcazar II*, 627 F.3d at 1291 and *Elvig*, 375 F.3d at 958 n.3) (Methodist

church's choirmaster); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177-

80 (5th Cir. 2012) (Catholic church's music director); *Sterlinski v. Catholic Bishop

of Chi.*, 934 F.3d 568, 569-72 (7th Cir. 2019) (Catholic church's organist).

Thus, *Shaliehsabou* fortified its conclusion that *mashgiachim* are "ministers"

by analogizing them to individuals performing a church's sacred musical duties:

"just as sacred music is integral to Catholicism, kosher food is an integral part of

Judaism." *Shaliehsabou*, 363 F.3d at 308.

### 3. The district court correctly relied on the Colpa Amici Brief and *Shaliehsabou*.

In holding Markel is a "minister," the district court first correctly relied on

two authorities as "persuasive." *First*, it highlighted the Colpa Amici Brief that

*Morrissey-Berru* cited with approval, which explained that "kosher-food

supervisors" are "ministers" because they "carry out functions that are central in

Jewish observance." (ER-15–16 (citing Colpa Amici Brief at 3-4)). On appeal,

Markel does not contend that the Colpa Amici Brief's assertion is inaccurate or

that the district court erred in relying on it, waiving the issue. *Velasquez-Gaspar v.

Barr*, 976 F.3d 1062, 1065 (9th Cir. 2020).

*Second*, the district court relied on *Shaliehsabou*. (ER-16–18). Although

Markel briefly discusses *Shaliehsabou* (AOB-35–36), his contentions lack merit.

Markel asserts that *Shaliehsabou* "is no longer controlling law" because it "preceded" *Hosanna-Tabor* and *Morrissey-Berru*. But he cites nothing in *Hosanna-Tabor* or *Morrissey-Berru* casting any doubt on *Shaliehsabou's* holding or reasoning. On the contrary, *Morrissey-Berru*, 140 S. Ct. at 2064 & n.11, cited with approval the Colpa Amici Brief, which explained that "kosher-food supervisors" are "ministers" in the Jewish faith and that *Shaliehsabou* was thus correctly decided. (Colpa Amici Brief at 3-4, 15).

Markel's attempts to distinguish *Shaliehsabou* on its facts are just as baseless. Markel is correct that the plaintiff there declared himself as "clergy," *Shaliehsabou*, 363 F.3d at 303, but Markel similarly refers to himself as "Head *Mashgiach*" and as a "supervisor of *kashruth*." (3-ER-290; 5-ER-900–01; 5-ER-834–35; 5-ER-759; 6-ER-982).

Markel asserts that the plaintiff there "was vested with substantial discretion to make religious decisions," but nothing in *Shaliehsabou* mentions any such "discretion"; on the contrary, the plaintiff "lacked independent authority" and would "consult with the Vaad for proper resolution of any concerns." 363 F.3d at 309. Markel's authority was similar: he consulted *poskim* and reported *halachic* issues to Rabbi Rabinowitz and others (3-ER-311; 5-ER-759; 5-834–37; 3-ER-315; 5-ER-905–06; 5-ER-828–33), and determined kosher production requirements

///

25

such as whether the grape product was *meshuval*. (3-ER-323; 5-ER-900; 5-ER-897–98; 3-ER-294; 5-ER-772).

Markel describes the plaintiff as having been "selected, prequalified, and disciplined" by the Vaad. But Markel, too, was selected by the Orthodox Union based on his qualifications, including a letter from an Orthodox rabbi certifying that he was a Sabbath observer who was trustworthy and fit to carry out the Orthodox Union's religious mission. (3-ER-295; 5-ER-689; 5-ER-855; 5-ER-901; 3-ER-297). Markel characterizes the plaintiff's "core function" as "to create and enhance the Jewish religious experience of his employer's residents." But Shaliehsabou did so by performing his role as *mashgiach* to ensure the food was kosher, 363 F.3d at 303, like Markel performed his role as *mashgiach* to ensure the grape products at the wineries met kosher standards.

Finally, Markel asserts that *Shaliehsabou* "did not involve any evidence that the employer had agreed to pay the employee overtime and had paid overtime to the employee in the past." But his assertion is inaccurate: the plaintiff "occasionally received additional hourly compensation for hours worked over eighty per bi-weekly period." 363 F.3d at 303. And Markel does not and cannot explain how his or Shaliehsabou's overtime compensation details are relevant to whether they were "ministers."

Because the Colpa Amici Brief's opinion about "kosher-food supervisors" is

indisputably accurate, and because *Shaliehsabou* was correctly decided and is indistinguishable, the district court correctly relied on them in holding that Markel is a "minister."

### 4. The district court correctly relied on *kashruth's* centrality to Orthodox Jewish belief.

Similar to *Shaliehsabou*, in holding Markel was a "minister" the district court also properly focused on the religious importance of *kashruth* to Orthodox Jewish belief. "The Hebrew term *kashrut*, meaning 'fit' or 'proper,' is the collective term for the Jewish laws and customs pertaining to the types of food permitted for consumption and their preparation. Because the dietary laws are closely related to holiness in several passages of the Bible, many scholars believe that the dietary laws were established to promote holiness rather than hygiene." (1-ER-20 (quoting Gerald F. Masoudi, *Kosher Food Regulation and the Religion Clauses of the First Amendment*, 60 U. Chi. L. Rev. 667, 668 (1993)). Again, Markel does not dispute the accuracy of the quoted assertion or contend that the district court erred in relying on it, waiving the issue. *Velasquez-Gaspar,* 976 F.3d at 1065.

Markel relies solely on mischaracterizations and quotations of unrelated statements misleadingly taken out of context in contending (AOB-57–58) that certifying food as kosher is not vital to Orthodox Jews' religious duty to eat only

kosher food. Markel quotes excerpts from the Orthodox Union's brief in unrelated litigation involving a constitutional challenge to New York's kosher fraud laws (3-ER-462), including the sentence, "Kosher food, in and of itself, has no religious significance." (AOB-1; AOB-57; 3-ER-475). But as the district court correctly explained, "Markel's citation takes the [Orthodox Union's] statement out of context." (1-ER-19). The Orthodox Union explained there that the plaintiffs' right to the free exercise of religion was not violated because they were prohibited solely from falsely advertising non-kosher products as kosher. As a result, they were "not disabled by the kosher fraud laws from *observing or choosing not to observe* dietary laws consistent with Jewish religious beliefs." (3-ER-475 (emphasis added)). "That certain foods are designated as 'kosher' does not signify or imply that they have received a special blessing. Food that is 'kosher' is merely food that is fit or proper for consumption according to Jewish dietary laws *It is the observance [of] the dietary laws themselves, as opposed to the actual food product, which implicates Jewish religious beliefs*." (3-ER-475) (emphasis added). Thus, the district court correctly concluded that "nothing in the [Orthodox Union's] prior litigation position contradicts the facts that Markel was employed as a *mashgiach* and that he was tasked with duties involving Jewish religious beliefs." (1-ER-19).

Markel also contends (AOB-58 (citing 3-ER-486)) that *kashruth* has no

religious significance, but he relies on a non-sequitur. He notes that, in that New York litigation, an Orthodox Union deponent testified that New York's kosher fraud laws protect consumers by ensuring that products advertised as "kosher" are kosher, like products advertised as "dairy free" should be dairy free. But Markel cites no authority suggesting that religious belief loses its religious character if it can benefit from anti-fraud laws analogous to anti-fraud laws without religious character. Markel similarly contends (AOB-58–59 (citing 3-ER-498–99)) that *kashruth* is not essential to the Jewish religion because certifying food as kosher is supposedly "no more demanding" or "difficult" than certifying food as "dairy free." This is another non-sequitur. He cites no authority suggesting that being a "minister" requires duties that are in some sense uniquely difficult.

Markel's mischaracterizations and non-sequiturs aside, the Court should decline Markel's invitation to investigate whether the Orthodox Union is wrong to believe that *kashruth* as integral to Jewish faith. "[T]here may be contexts in which drawing a distinction between secular and religious teaching is necessary, but it is inappropriate when doing so involves the government challenging a religious institution's honest assertion that a particular practice is a tenet of its faith." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018). "[N]ot only is this type of religious line-drawing incredibly difficult, it impermissibly entangles the government with religion." *Ibid*. "This does not

29

mean that we can never question a religious organization's designation of what constitutes religious activity, but we defer to the organization in situations like this one, where there is no sign of subterfuge." *Ibid.* Markel does not and cannot cite evidence that the Orthodox Union's belief that *kashruth* is integral to Orthodox Jewish belief is mere subterfuge.

Thus, the district court correctly held that *kashruth*'s integral role in Orthodox Jewish faith also supports Markel's status as a "minister."

### 5. The district court correctly applied *Hosanna-Tabor*.

The district court next correctly concluded that if they are relevant all four factors discussed in *Hosanna-Tabor* support Markel's "ministerial" status. (1-ER-20–22). *First*, Markel was called the "Head *Mashgiach*" by both himself and the Orthodox Union (1-ER-21; 3-ER-290; 5-ER-900–01; 5-ER-834–35; 5-ER-759), one of "Judaism['s] many 'ministers.'" *Morrissey-Berru*, 140 S. Ct. at 2064 & n.11; Colpa Amici Brief at 3-4 ("kosher-food supervisors" are "ministers").

*Second*, "Markel's position 'reflected a significant degree of religious training.'" (1-ER-21) (quoting *Morrissey-Berru*, 140 S. Ct. at 2062). For Markel to be hired as a *mashgiach*, he had to be Jewish, *shomer Shabbat*, *shomer mitzvot*, and *shomer kashrut* (3-ER-269; 5-ER-689); he refers to himself as a *Frum* Jew. (3-ER-300; 5-ER-845; 5-ER-769). He needed to be knowledgeable about Jewish law (3-ER-277–78; 5-ER-689), and to submit a letter from an Orthodox rabbi certifying

that he was a Sabbath observer who was trustworthy and fit to carry out the Orthodox Union's religious mission. (3-ER-295; 5-ER-689; 5-ER-855; 5-ER-901; 3-ER-297). He was raised in an Orthodox Jewish home in which his father ran a kosher supervision agency (3-ER-299; 5-ER-881–82), attended Jewish Day school where he also learned about keeping kosher (3-ER-301; 5-ER-891), was previously employed for more than ten years as a *mashgiach* with a different kosher agency (3-ER-303; 5-ER-895–99), and worked as a *mashgiach* at his father's kosher supervision agency. (3-ER-304; 5-ER-881–84; 5-ER-848–51).

*Third*, Markel "held himself out as a minister" of the Orthodox Union. (1-ER-21–22; *Morrissey-Berru*, 140 S. Ct. at 2068). He not only referred to himself as "Head *Mashgiach*," he also acknowledged his role's importance, admitting that his duties were to apply Jewish rules of *kashruth* for food production according to religious regulations (6-ER-982), and explaining to *mashgiachim* under his supervision, "[r]emember that we represent the Jewish community and I hope our time here will leave the Delano workers with a sense of respect for Jewish people and our culture." (5-ER-773).

*Fourth*, Markel's duties as Head *Mashgiach* reflected the Orthodox Union's religious mission and the importance of supervising the kosher production of grape products for the Orthodox Jewish faith. (1-ER-21; 3-ER-226; 5-ER-687; 5-ER-718; *Morrissey-Berru*, 140 S. Ct. at 2068). Markel consulted *poskim* who assisted him

31

with his duties, reported *halachic* issues to rabbis senior to him (3-ER-311; 5-ER-759; 5-834–37; 3-ER-315; 5-ER-905–06; 5-ER-828–33), and requested *Piskei Dinim* for assistance with issues. (3-ER-311; 5-ER-835–57). Although he was not a "teacher" as were the plaintiffs in *Hosanna-Tabor* and *Morrissey-Berru*, he provided detailed instructions regarding the koshering of grape products at the Delano and Gallo wineries (3-ER-292; 5-ER-767–68), and supervised and instructed workers on how to maintain kosher standards (3-ER-319; 5-ER-907–08), applying the tenants of the Jewish faith to his work. (3-ER-311; 5-ER-835–57). In short, without kosher certification with Markel's and other *mashgiachim's* assistance, it would be harder for Orthodox Jews to keep the divine commandment of eating kosher food.

### 6. Markel's scattered and repetitive contentions lack merit.

Markel's remaining contentions why he supposedly was not a "minister" are scattered into two largely repetitive sections of his brief. (AOB-19–23 and AOB-65–69). None have merit. Markel notes (AOB-19; AOB-67) that he is not a rabbi. But "ministers" are not limited to members of the Jewish faith who are "rabbis." *Morrissey-Berru*, 140 S. Ct. at 2064. On the contrary, as noted, "Judaism has many 'ministers,'" a term that "encompasses an extensive breadth of religious functionaries in Judaism," *ibid.*, including "kosher-food supervisors." (Colpa Amici Brief at 3-4).

32

Although Markel asserts that he did not have "significant religious training" (AOB-67), he was raised in an Orthodox Jewish home in which his father ran a kosher supervision agency (3-ER-299; 5-ER-881–82), he attended Jewish Day school where he also learned about keeping kosher (3-ER-301; 5-ER-891), he was employed for more than ten years as a *mashgiach* with a different kosher agency (3-ER-303; 5-ER-895–99), and worked as a *mashgiach* at his father's kosher supervision agency. (3-ER-304; 5-ER-881–84; 5-ER-848–51).

Markel's unsupported assertion (AOB-19–20; AOB-67) that he did not receive "training" from the Orthodox Union is contradicted by the record. Markel consulted *poskim* and reported *halachic* issues to rabbis superior to him (3-ER-311; 5-ER-759; 5-834–37; 3-ER-315; 5-ER-905–06; 5-ER-828–33), and requested *Piskei Dinim* for assistance. (3-ER-311; 5-ER-835–57). Although Markel asserts (AOB-19; AOB-67) that he "was not participating in any sort of seminary or religious ordination program" and that the Orthodox Union does not offer such programs, he cites no authority that either is necessary for "ministerial" status.

Markel asserts (AOB-19-20) that there was "no interview or screening process to ensure that he, or the other kosher supervisors, 'followed the Torah,'" but the undisputed evidence is that to be retained as a *mashgiach* by the Orthodox Union he had to submit a letter from an Orthodox rabbi certifying that he was a Sabbath observer who was trustworthy and fit to carry out the Orthodox Union's

33

religious mission. (3-ER-295; 5-ER-689; 5-ER-855; 5-ER-901; 3-ER-297). The Orthodox Union "thought that [Markel] had a sufficient understanding" of *kashruth* to fulfill its mission, "and judges have no warrant to second-guess that judgment or to impose their own credentialing requirements." *Morrissey-Berru*, 140 S. Ct. at 2068.

Markel asserts (AOB-20–22; AOB-67) that he did not "teach" or "preach" "religion" or "Judaism" and was not told that he was, and did not consider himself to be, an "ambassador of the Jewish people." But the Orthodox Union views *mashgiachim* as ambassadors of the Jewish people who provide a religious function (3-ER-273; 5-ER-689; 4-ER-440–41), and Markel instructed *mashgiachim* under his supervision to "[r]emember that we represent the Jewish community." (5-ER-773). *Morrissey-Berru* held that the plaintiffs were "ministers" in part because they, like Markel, furthered their faith "by word *and deed*." 140 S. Ct. at 2067 (italics added). Markel also instructed *mashgiachim* and other workers on the procedures and requirements for making kosher grape products in reliance on *Piskei Dinim* (3-ER-311; 5-ER-835–57; 3-ER-319; 5-ER-907–08), including koshering tanks (3-ER-325; 5-ER-908–11; 3-ER-327; 5-ER-913–14; 3-ER-330; 5-ER-921–23) and maintaining proper seals. (3-ER-307; 5-ER-765–66).

Markel contends (AOB-21–22; AOB-68–69) that he was not engaged in

34

"religious duties," but was engaged in "factory work" such as "sanitizing large drums, signing bills of lading, crushing grapes, moving hoses, reconstituting juice concentrate, [and] sealing drums and vats," "identical to the duties of non-Jewish factory workers." But *Hosanna-Tabor* and *Shaliehsabou* rejected similar contentions. *Hosanna-Tabor* held that the plaintiff was a "minister" even though "her duties as a called teacher were identical to her duties as a lay teacher." *Hosanna-Tabor*, 565 U.S. at 181. In *Shaliehsabou*, the *mashgiach* contended that he was not a "minister" because "his primary duties involved nothing more than inspecting incoming food deliveries and ensuring the kosher preparation of food," 363 F.3d at 308, including "opening and closing the refrigerators to insure the integrity of the kosher status of the kitchen, insuring that all meat and dairy products were stored and kept separate during food preparation," "lighting all ovens and heating equipment in accordance with the requirements of Jewish law," and "cleans[ing] kitchen utensils and other items of they became non-kosher." *Id*. at 303. The Fourth Circuit disagreed, holding that "Shaliehsabou, through his *mashgiach* tasks, performed sacerdotal duties." *Id*. at 309. "As a juridical religion, Judaism is dependent upon compliance with its laws, including the kashruth, and Shaliehsabou was the vessel through whom compliance with the *kashruth* was ensured for residents at the Hebrew Home." *Ibid*. "[W]e cannot say, given the importance of dietary laws to the Jewish religion, that the duties of *mashgichim* do

35

not involve religious worship and ritual." *Ibid*. On the contrary, "failure to apply the ministerial exception" to *mashgiachim* like Shaliehsabou "would denigrate the importance of keeping kosher to Orthodox Judaism." *Ibid*. Markel too, "through his *mashgiach* tasks, performed sacerdotal duties."

Moreover, Markel's litigation position contradicts what he told his reports: that *mashgiachim's* personal involvement in all parts of the production process was needed to ensure the grape product was kosher. (5-ER-772–73). Markel wrote, "*Mashgicim* will run the presses, evaporators, pumps, sluicing, etc.," "down to the smallest act of opening a valve to take a sample," because "[o]nly your alertness and involvement is what will make this a 100% kosher product." (5-ER-772–73). Thus, Markel's personal involvement was part of the kosher process, integral to Jewish religious belief.

Further, as in *Shaliehsabou*, Markel's duties had "no secular health or safety rationale." 363 F.3d at 302. For example, Markel's most important duties included ensuring that no *goyim* (non-Jews) touched the grape product before it was *meshuval* (3-ER-323; 5-ER-900; 5-ER-897–98; 3-ER-294; 5-ER-772), and overseeing special cleaning of the equipment when non-kosher items were also processed at the facility to ensure the kosher integrity of grape product. (3-ER-266–67; 4-ER-441–42; 4-ER-445). Markel does not and cannot contend those duties had any non-religious purpose. And the Orthodox Union's *mashgiachim* are

36

responsible for only the products to be certified as kosher, not for any non-kosher items (3-ER-261–62; 5-ER-795–97), further contradicting the notion that *mashgiachim* have solely a non-religious purpose.

*Hosanna-Tabor* is instructive for another reason. The plaintiff there was a "minister" even though "her religious duties consumed only 45 minutes of each workday, and the rest of her day was devoted to teaching secular subjects." 565 U.S. at 193. Because Markel's duties as Head *Mashgiach* were *entirely* religious, his status as a "minister" is clearer than the teacher's in *Hosanna-Tabor*. Moreover, even if, contrary to Markel's written description (5-ER-772–73), Markel spent some of his time on duties that could be considered non-religious, *Hosanna-Tabor* holds that would not change his status as a "minister." "The amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed." *Hosanna-Tabor*, 565 U.S. at 194. The nature of Markel's function was to ensure kosher grape product, integral to Orthodox Jewish faith.

Markel contends that he was not a "minister" because he simply "followed" a "checklist" of "policies" and "rules" that he received from the Orthodox Union. (AOB-22; AOB-68). But *Hosanna-Tabor* rejected a similar argument, holding that Biel was a "minister" even though she "taught religion from a book required by the

school." 140 S. Ct. at 2068. Markel makes the similar contention (AOB-22; AOB-68) that he was not a "minister" because when *halachic* issues arose he "had no authority to make his own decision" and no "discretion" to "modify" the "rules." But he cites no authority that "ministers" must have a certain amount of religious decision-making or discretionary authority. On the contrary, *Shaliehsabou* held the plaintiff *mashgiach* was a "minister" even though he "lacked independent authority to make some decisions regarding food preparation," reasoning "there is no requirement that an individual have the final say on spiritual matters." 363 F.3d at 309; *see also Grussgott*, 882 F.3d at 660 ("whether Grussgott had discretion in planning her lessons is irrelevant" to whether she was a "minister").

In sum, as church employees with religious musical duties are "ministers" because sacred music is essential to Christianity, *Diocese of Raleigh, Starkman, Cannata, Sterlinski*, *mashgiachim* like Markel and Shaliehsabou are "ministers" because "kosher food is an integral part of Judaism." *Shaliehsabou*, 363 F.3d at 308. Holding otherwise "would denigrate the importance of keeping kosher to Orthodox Judaism." *Shaliehsabou*, 363 F.3d at 309.

///

///

///

C. **The district court correctly held that the Orthodox Union is a religious institution.**

1. **The district court's reasoning is correct.**

Although the Supreme Court and Ninth Circuit have not defined "religious institution" under the First Amendment's "ministerial exception," the Ninth Circuit has interpreted and applied Title VII's religious organization exception ("ROE"). The ROE states that Title VII does not apply to "'a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1003 (9th Cir. 2019) (quoting 42 U.S.C. § 2000e-1(a)). "In applying the ROE," the Ninth Circuit "determine[s] whether an institution's purpose and character are primarily religious by weighing [a]ll significant religious and secular characteristics." *Id.* (quotation marks omitted, brackets in original).

For example, *Garcia* held that the Salvation Army is primarily religious, reasoning that "the Salvation Army is a 'church' under the Internal Revenue Code," it "holds regular religious services," it "offers social services to customers regardless of their religion to reach new populations and spread the gospel," and its "mission statement describes it as 'an evangelical part of the universal Christian

39

church.'" *Ibid*. Similarly, *Spencer*, 633 F.3d at 724, held the ROE covered the defendant. In his concurrence, Judge O'Scannlain concluded that the defendant, which describes itself as "a Christian humanitarian organization," is primarily religious because it is "a nonprofit entity" and it "1) is organized for a self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious." *Id*. at 725, 734 (O'Scannlain, J. concurring).

The district court explained that although this case involves the First Amendment's ministerial exception, "Ninth Circuit case law" on the ROE "provides a starting point in evaluating whether the [Orthodox Union] is a religious institution for the purpose of this case," and that in particular under "Judge O'Scannlain's simplified test in *Spencer*, the [Orthodox Union] meets the requirements for a 'religious organization.'" (1-ER-25). Again, Markel does not contend that the district court erred in taking guidance from Ninth Circuit case law applying the ROE or in giving particular weight to Judge O'Scannlain's concurrence in *Spencer*, waiving the issue. *Velasquez-Gaspar*, 976 F.3d at 1065.[4]

_____

[4] The district court also cited similar multipart tests employed in other cases but did not heavily rely on them. (1-ER-20–21 & n.50 (citing *EEOC v. Townley Eng'g &*

40

In holding that the Orthodox Union is a religious institution, the district court first correctly reasoned that the Orthodox Union "is a 26 U.S.C. § 501(c)(3) not-for-profit corporation with a mission of supporting the Orthodox Jewish faith" (1-ER-22 (citing 3-ER-207–211 & 5-ER-758)), similar to the Salvation Army and World Vision. *Garcia*, 918 F.3d at 1002; *Spencer*, 633 F.3d at 735 (O'Scannlain, J., concurring).

Having acknowledged the Orthodox Union's tax-exempt status, the district court held, "[w]eighing the three *Spencer* factors, the [Orthodox Union] should be considered a 'religious organization' for purpose of the 'ministerial exception.'" (1-ER-26 (citing *Spencer*, 633 F.3d at 734 (O'Scannlain, J., concurring)). As to the first factor, the district court reasoned that the Orthodox Union's Articles of Incorporation provide that its objectives are "to uphold and strengthen the observance of orthodox Judaism" "by associating and uniting such congregations, organizations and individuals as adhere to or profess orthodox Judaism and affording them mutual aid and encouragement in religious faith and devotion to their common ideals," and by "encouraging the maintenance of synagogues,

///

---

*Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988), *EEOC v. Kamehameha Sch./Bishop Est.*, 990 F.2d 458 (9th Cir. 1993), and *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007)).

schools, and other institutions for teaching or practicing the principles of orthodox Judaism." (1-ER-25 (citing ER-758)).

As to the second factor, the district court reasoned that "[t]he [Orthodox Union's] services include kosher food production that enables religiously devout Jews to keep kosher." (1-ER-25). As to the third factor, the district court reasoned that "the [Orthodox Union] provides education and advocacy programs to the larger Jewish community." (1-ER-25–26 (citing 3-ER-224–25)).

Thus, the district court correctly held that the Orthodox Union is primarily religious and thus protected by the ministerial exception.

### 2. Markel's scattered and repetitive contentions lack merit.

Markel's contentions that the district court erred are again scattered into two largely repetitive sections. (AOB-17–19; AOB-55–65). None have merit. First, Markel again relies on misrepresentations and on unrelated statements taken completely out of context. He contends that the Orthodox Union is not a religious institution because when it applied for a $10,000,000 loan under the Paycheck Protection Program, it did so using two codes under the North American Industry Classification System ("NAICS"): not only Code 813110 for "Religious Organizations," but also Code 722310 for "Food Service Contractors." (AOB-17–18; AOB-59–60 (citing 5-ER-702 & 5-ER-661–663)). Yet as the District Court correctly reasoned, "the [Orthodox Union] explained in its addendum to its

Paycheck Protection Program application that it qualified under both NAICS

numbers, and Markel presents no evidence or case law that invalidates the

[Orthodox Union's] status as a 'religious institution.'"  (1-ER-27 (citing 5-ER-

702)).  Markel also claims falsely that the Orthodox Union's application stated it

"is 'most aptly' described as a Food Service Contractor, not a Religious Entity."

(AOB-17 (citing 5-ER-702)).  Instead, the Orthodox Union's application stated

that *of the NAICS Codes "beginning with 72…,"* "[t]he most apt NAICS Code we

believe is 722310."  (5-ER-702 (emphasis added)).  The application did not state

that the Orthodox Union is more aptly considered a food service contractor instead

of a religious institution.

Next, Markel reprises his false claim (AOB-18; AOB-57–59) that the

Orthodox Union stated in an unrelated case involving New York's kosher fraud

laws that certifying food as kosher is not vital to Orthodox Jews' religious duty to

eat only kosher food.  Yet as shown above at pages 27-28, Markel's contention

mischaracterizes and takes out of context the Orthodox Union's statements.  And

again putting aside Markel's mischaracterization and decontextualization, Markel

invites the Court to get into an impermissible religious entanglement.

"[D]etermining whether an activity is religious or secular requires a searching

case-by-case analysis.  This results in considerable ongoing government

///

43

entanglement in religious affairs." *Spencer*, 633 F.3d at 730 (O'Scannlain, J., concurring) (quotation marks omitted).

Next, Markel claims falsely (AOB-18; AOB-62) that the Orthodox Union admitted that kosher certification is only for food, yet it certifies non-food products. But Markel's contention fails on the facts and the law. First, the Orthodox Union made no such admission that kosher certification is only for food, and Markel cites none in the record. Second, Markel cites no authority for his legal argument that the Orthodox Union's kosher certifications for non-food items means that the certifications are not integral to Jewish religious belief or that the Orthodox Union is not a religious institution.

Next, Markel claims falsely (AOB-18; AOB-61–62) that the Orthodox Union admitted that it sells its services and trademarks as a marketing tool, not a religious tool. But again, Markel's contention fails factually and legally. The Orthodox Union made no such admission, and Markel cites none in the record. Although the record discloses that the Orthodox Union's kosher certifications may be used to market the certified products to religious Jews and others who desire kosher products, Markel cites no authority that the Orthodox Union therefore is not a religious institution. Although Markel cites his declaration (4-ER-497) for the proposition that "many non-Jewish people, as well as many non-Orthodox people buy kosher certified products for a variety of reasons, including marketing reasons

44

or because they believe the product to be better quality," his suggestion that this means that kosher certification is not integral to Jewish religious belief again invites the Court into an impermissible religious entanglement. "If we should not be in the business of determining whether a particular 'activity' is religious or secular, our competence to make that determination with respect to a particular 'product' or 'service' is in serious doubt." *Spencer*, 633 F.3d at 730 (O'Scannlain, J., concurring).

Next, Markel contends (AOB-18–19; AOB-55–57) that the Orthodox Union is not a religious institution because it generates revenue from its kosher certifications. But his key factual assertions are, again, unsupported by the record. (1) Markel claims (AOB-55) that the Orthodox Union "devotes the majority of its resources" to its kosher certifications, but the cited record establishes that the Orthodox Union devotes a majority of only its *Kosher Division's* resources to kosher certifications. (5-ER-606–09). The Orthodox Union has other Divisions through which it provides religious activities to its association of synagogues and the Orthodox Jewish community, including religious advocacy, religious study programs, and religious youth programs. (3-ER-224; 5-ER-687; 5-ER-717–18; 5-ER-694; 5-ER-782–83). And (2) Markel claims (AOB-56) that the Orthodox Union "generates over $120 million in revenue annually," "pays its top employees high six figure salaries," and "has an annual operating budget of $135 million."

45

But Markel cites 4-ER-550, which the district court excluded as inadmissible hearsay (1-ER-26), a ruling that Markel does not appeal, waiving the issue, *Velasquez-Gaspar,* 976 F.3d at 1065, and he cites 4-ER-564, which supports none of the assertions.

Markel's contention is also legally unsupported. Markel "do[es] not explain how the scope of [the Orthodox Union's] operations changes the undisputed fact that [the Orthodox Union] is a nonprofit entity which the IRS has classified as a 501(c)(3) tax-exempt organization." *Spencer*, 633 F.3d at 735 (O'Scannlain, J., concurring) (alterations added). The Orthodox Union's Kosher Division earns income through its kosher certification process, which the Orthodox Union uses to finance its activities supporting the Orthodox Jewish Community (3-ER-339; 5-ER-719; 5-ER-790; 5-ER-694), including the religious advocacy, religious study programs, and religious youth programs identified above. (3-ER-224; 5-ER-687; 5-ER-717–18; 5-ER-694; 5-ER-782–83). As the district court rightly explained, "[t]he [Orthodox Union's] not-for-profit status is not invalidated simply because the [Orthodox Union's] kosher certification division generates a profit and thereby funds its religious and advocacy missions." (1-ER-26). As the district court also correctly explained, "*Morrissey-Berru* and *Hosanna-Tabor* involved religious schools that generated income, but that fact did not disqualify them from qualifying as 'religious institutions[s].'" (1-ER-26–27 (alteration in original).

Moreover, like the Salvation Army, *Garcia*, 918 F.3d at 1002, the Orthodox Union relies on donations from individuals, foundations, and synagogues as well as revenue from sales. (3-ER-210; 5-ER-718; 5-ER-695).

Markel's related contention (AOB-56) that the Orthodox Union is not a religious institution because it sues to prevent infringement of its kosher trademark is not sensible. If the Orthodox Union permitted the improper use of its mark on products it had not certified, the mark would be meaningless and the Jewish community could no longer rely on the Orthodox Union's kosher certification to confirm products bearing it were kosher certified under Jewish religious standards.

Next, Markel contends (AOB-60–61) that the Orthodox Union is not a religious institution because *mashgiachim* are sometimes referred to colloquially as "rabbi" and Delano has no preference whether the *mashgiachim* who certify their grape products are ordained rabbis. Markel's contentions are preposterous as one need not be a rabbi to be a minister.

Next, Markel suggests (AOB-62–64) that the Orthodox Union is not a religious institution because its Articles of Incorporation are too old. Markel cites no supporting authority, which is to the contrary. *Garcia*, 918 F.3d at 1001 (noting the Salvation Army was founded as an evangelical ministry in 1865 in holding it is covered by the ROE).

Finally, Markel (AOB-65) contends that the Orthodox Union is not a

religious institution because it "does not give away or subsidize its services." He claims this result is mandated by language in Judge Kleinfeld's concurrence in *Spencer*, although he fails to identify it as a concurrence. (AOB-64–65 (quoting *Spencer*, 633 F.2d at 747 (Kleinfeld, J., concurring)). Markel's contention fails. First, as Judge O'Scannlain persuasively explained, "[b]ecause a nonprofit," such as the Orthodox Union, "may not distribute its net earnings to its organizers or employees, the fact that an entity is structured as a nonprofit provides strong evidence that its purpose is purely nonpecuniary." *Spencer*, 633 F.3d at 734-35 (O'Scannlain, J., concurring). "A nonprofit entity must spend any net earnings to advance its tax-exempt purpose, and may not distribute its net earnings to its principals as dividends, bonuses, or excessively high salaries." *Id*. at 734. Second, even Judge Kleinfeld's concurrence conceded that "religious schools may charge market rates as tuition" and still satisfy the ROE, *id*. at 747 (Kleinfeld, J., concurring), contradicting the notion that the Orthodox Union destroys its religious character by charging market rates for its kosher certifications. Third, Judge Kleinfeld was motivated by Ninth Circuit precedent stating that the ROE must be "construed 'narrowly.'" *Id*. at 727 (O'Scannlain, J., concurring) (quoting *Kamehameha Sch.*, 990 F.2d at 460); *id*. at 741 (Kleinfeld, J., concurring) (noting that he concurs in this portion of Judge O'Scannlain's concurrence). But *Morrissey-Berru* explicitly held that the First Amendment's ministerial exception

should *not* be "interpreted narrowly." 140 S. Ct. at 2068. Thus, the Orthodox

Union is a religious institution even though it does not give away or subsidize its

kosher certification services.

For all the above reasons, the district court correctly held that the Orthodox

Union is a religious institution.

### D. The district court correctly held that Markel's claims are barred.

#### 1. The ministerial exception encompasses all tangible employment actions including hiring and compensation decisions.

The Ninth Circuit has established the types of claims barred by the

ministerial exception over the course of four published panel opinions and one en

banc opinion. First, *Bollard*, 196 F.3d at 944, held the ministerial exception did

not bar the ministerial plaintiff's claim for sexual harassment. *Bollard*

acknowledged that "the ministerial relationship lies so close to the heart of the

church that it would offend the Free Exercise Clause simply to require the church

to articulate a religious justification for its personnel decisions," *id*. at 946, such as

"the determination of a minister's salary." *Id*. at 947. But because the plaintiff's

alleged sexual harassment was not such a personnel decision, it was not barred. *Id*.

at 946-47.

Later, *Elvig* held that the ministerial plaintiff's sexual harassment claim was

barred by the ministerial exception to the extent she alleged a "tangible

49

employment action," which includes decisions such as "hiring" or those "causing a significant change in benefits." *Elvig*, 375 F.3d at 960-62. "Because the Church cannot be required to articulate a justification for [such] ministerial decisions, Elvig cannot show that those decisions were tangible employment actions related to the hostile environment to which she was subjected." *Id*. at 961-62[5]. Moreover, "[j]ust as the ministerial exception precludes Elvig from alleging Title VII *claims* that implicate the Defendants' protected ministerial decisions, it similarly precludes her from seeking *remedies* that implicate those decisions." *Id*. at 966 (emphases in original). "Consequently, a damage award based on lost or reduced pay Elvig may have suffered from those employment decisions would necessarily trench on the Church's protected ministerial decisions. The same would be true of emotional distress or reputational damages attributable to those decisions." *Ibid*.

Next, *Werft v. Desert Southwest Ann. Conf.*, 377 F.3d 1099, 1103-04 (9th Cir. 2004) (per curiam) held that the ministerial plaintiff's claim for failure to accommodate his disability under Title VII was barred by the ministerial exception. The court reasoned, "[i]f allowed to proceed, the Church would necessarily be required to provide a religious justification for its failure to

---

[5] The tangible employment actions at issue were alleged discriminatory removal of certain duties, suspension, termination, and refusal to permit the circulation of a personal information form to find new employment. *Id*. at 965.

accommodate and this is an area into which the First Amendment forbids us to tread." *Id*. at 1103.

Finally, *Alcazar I* and *II* held the ministerial exception barred the ministerial plaintiff's state-law claim for unpaid overtime. The plaintiff Rosas was a Catholic seminarian. *Alcazar I*, 598 F.3d at 670. "The Catholic Church required [him] to participate in a ministry training program at St. Mary Catholic Church in Marysville, Washington as [his] next step in becoming [an] ordained priest[.]" *Id*. Rosas sued "for violations of Washington's Minimum Wage Act for failure to pay overtime wages." *Id*. at 670-71. The district court dismissed the overtime wage claim on the pleadings on the ground it was barred by the ministerial exception, and the Ninth Circuit panel affirmed. *Id*. at 670.

*Alcazar I* explained that "[e]ntanglement has substantive and procedural components. On a substantive level, applying [a] statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake." *Id*. at 672 (citations and quotation marks omitted, brackets in original). "As for the procedural dimension, the very process of civil court inquiry into the clergy-church relationship can be sufficient entanglement. It is not only the conclusions that may be reached by [the court] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."

51

*Id*. at 672-73 (quotation marks omitted).

Rosas argued that "the decision whether to pay him overtime wages is not the sort of religious practice the First Amendment shields from secular examination." *Id*. at 674. The panel disagreed "for two separate reasons." *Id*. at 674. First, Rosas' lawsuit sought impermissibly to interfere with the church's decision to classify him as a seminarian, violating "the Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers," which is "the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant." *Ibid*. Second, "[j]ust as the initial function of selecting a minister is a matter of church administration and government, so are the *functions which accompany such a selection[, including] the determination of a minister's salary*." *Ibid*. (quotation marks and citation omitted, emphasis and second brackets in original). "The ministerial exception encompasses all 'tangible employment actions' and disallows lawsuits for damages based on 'lost or reduced pay.'" *Ibid*. (quoting *Elvig*, 375 F.3d at 964, 966). "Such damages would 'necessarily trench on the Church's protected ministerial decisions.'" *Ibid*. (quoting *Elvig*, 375 F.3d at 966).

*Alcazar II* adopted this portion of the panel's opinion. *Alcazar II*, 627 F.3d at 1290. *Alcazar II* reiterated *Bollard*'s observation that "'the ministerial relationship lies so close to the heart of the church that it would offend the Free

Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions.'"  *Id.* at 1291 (quoting *Bollard*, 196 F.3d at 946). Rosas alleged that "[a]s part of his seminary training," he "performed duties such as maintenance and assisting with mass," for which he was "paid a comprehensive weekly wage": he "worked eight to nine hours a day, seven days a week and was paid $225 per week."  *Id.* at 1292-93.  Rosas "challenges the church's wages for his duties as a seminarian."  *Id.* at 1292.  But "[b]ecause the ministerial exception applies to those claims," the en banc panel "affirm[ed] the district court's dismissal of the complaint."  *Id.* at 1293.

### 2. Because Markel challenges only tangible employment actions, his claims are barred.

The district court held that Markel's claims are barred under *Alcazar* and *Elvig*.  (1-ER-28–29).  The district court was correct.  Like Rosas in *Alcazar*, Markel sued the Orthodox Union for unpaid overtime or "doubletime" under the California Labor Code.  (6-ER-983).  Markel's overtime claim is barred for both reasons stated in *Alcazar I*.  First, it seeks to interfere with the Orthodox Union's right to make "personnel decisions concerning its ministers"—the Orthodox Union's decision to retain him as an independent contractor.  Second, it seeks to interfere with the Orthodox Union's "determination of [its] minister's salary." *Alcazar I*, 598 F.3d at 674; *see also Shaliehsabou*, 363 F.3d at 303-04 (ministerial

53

exception bars *mashgiach's* FLSA claim for unpaid wages); *Schleicher v. Salvation Army*, 518 F.3d 472, 474, 477-78 (7th Cir. 2008) (ministerial exception bars minister's FLSA claims for unpaid overtime and minimum wages).

Markel's derivative claim for statutory penalties for failure to provide itemized wage statements seeks another *remedy* for his barred claim that the Orthodox Union wrongfully retained him as an independent contractor. Therefore, it too is barred. *Elvig*, 375 F.3d at 966.

Markel's claims for intentional and negligent misrepresentation are barred too for similar reasons. Markel alleges that the Orthodox Union misrepresented that it would "hire him to a salaried management position including a raise commensurate with the promotion." (6-ER-985). But these claims again seek to interfere with the Orthodox Union's decision-making on the "tangible employment actions" of (1) whether to "hir[e]" Markel, *Elvig*, 375 F.3d at 960-61, and (2) "the determination of [his] salary." *Alcazar I*, 598 F.3d at 674. And because the ministerial exception bars his *claims* based on those tangible employment actions, it also bars his request for *remedies* based on those tangible employment actions in the form of damages for lost "salary and benefits" and for "mental and emotional distress." *Elvig*, 375 F.3d at 966. As the Supreme Court explained in the context of a wrongful termination claim, an award of "frontpay in lieu of reinstatement, backpay, compensatory and punitive damages, and attorney's fees" "would operate

54

as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." *Hosanna-Tabor*, 565 U.S. at 194.

Finally, because Markel's claim for unfair business practices for "failure to pay earned wages in the form of overtime" is derivative of his barred claims (6-ER-984), it too is barred. *Elvig*, 375 F.3d at 966.

### 3. Markel's scattered and repetitive contentions lack merit.

Again, Markel's contentions that the district court erred are scattered and repetitive. (AOB-23–55; AOB-69–70). None have merit. First, Markel contends (AOB-23–29) that the ministerial exception does not bar his claims because the exception applies only to some vaguely-defined but limited set of tangible employment actions, such as the "training, hiring, firing, or retention" of a minister. (AOB-24)[6]. Yet Markel's claim is that the Orthodox Union was allegedly required to hire him as an employee but failed to do so. (6-ER-984 (alleging the Orthodox Union wrongfully retained him as an independent contractor); 6-ER-985 (alleging the Orthodox Union misrepresented it would

---

[6] Different phrasings appear at AOB-24 ("selection, supervision, education, disciplining or firing"), AOB-29 ("select, hire, fire, or discipline"), AOB-31 ("select, hire, fire, discipline, or train"), and AOB-32 ("hiring, firing, disciplining or training").

"hire" him to a salaried management position)). Thus, his claims are barred even under his incorrect description of the ministerial exception's scope.

Second, his description of the ministerial exception's scope is incorrect. As explained above, the Ninth Circuit explicitly held that the ministerial exception "encompasses *all* 'tangible employment actions,'" *Alcazar I*, 598 F.3d at 674 (emphasis added), including "the determination of a minister's salary." *Id*. (emphasis and citation omitted). Markel seeks support for his incorrect description of the ministerial exception in lengthy and selectively bolded quotes from *Hosanna-Tabor* and *Morrissey-Berru* and from one Tenth Circuit case. (AOB-23–29). But *Morrissey-Berru* described the "ministerial exception" broadly: "[u]nder this rule, courts are bound to stay out of *employment disputes* involving those holding certain important positions with churches and other religious institutions." 140 S. Ct. at 2060 (emphasis added). Moreover, *Hosanna-Tabor* and *Morrissey-Berru* focused on a religious institution's right to "select" or "terminate" its minister because both cases involved only claims for wrongful termination. *Hosanna-Tabor*, 565 U.S. at 176; *Morrissey-Berru*, 140 S. Ct. at 2057-59. The Tenth Circuit case is irrelevant, as it held only the "single jurisdictional issue" that an order denying summary judgment based on the ministerial exception is not immediately appealable as a collateral order. *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1024-25 (10th Cir. 2022). And Markel cites no binding or even

56

persuasive authority supporting his incorrect description of the ministerial exception's scope.

Next, Markel contends that the ministerial exception does not bar his claims because the Orthodox Union has not shown that it made a "religious decision" or articulated a "religious reason" in retaining him as an independent contractor and paying him agreed compensation. (AOB-29; AOB-41)[7]. But the Supreme Court and Ninth Circuit have repeatedly held that the ministerial exception bars litigation over ministerial decisions whether or not made for a religious reason. *Hosanna-Tabor*, 565 U.S. at 194 (plaintiff's contention that the defendant's "asserted religious reason for firing" her was "pretextual" "misses the point of the ministerial exception," which is "not to safeguard a church's decision to fire a minister only when it is made for a religious reason"); *Bollard*, 196 F.3d at 946-47 ("the ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions," including "the determination of a minister's salary"); *Alcazar II*, 627 F.3d at 1291 (same); *Alcazar I*, 598 F.3d at 674 (rejecting plaintiff's argument that "the decision whether to pay him overtime

---

[7] Markel sadistically repeats this contention over a dozen more times. (AOB-30, 31, 32, 34, 35, 36, 37, 38, 39, 41, 43, 44, 45, 47, 63 & 70).

wages is not the sort of religious practice the First Amendment shields from

secular examination"); *Elvig*, 375 F.3d at 961-62 ("the Church cannot be required

to articulate a justification for its ministerial decisions").

Next, Markel contends that the ministerial exception does not bar his claims

because they are "akin to a breach of contract claim." (AOB-35; AOB-38–42

(citing *Sumner v. Simpson Univ.*, 27 Cal. App. 5th 577 (2018))). Markel's

contention fails for two reasons. *First*, Markel did not sue for breach of contract

(6-ER-981–92); he claims only that the Orthodox Union wrongfully retained him

as an independent contractor and misrepresented that it would hire him to a

salaried management position. (6-ER-983–85). He thus waived any claim for

breach of contract. *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th

Cir. 2006). Markel's assertion that "Appellees' position is that they dispute

whether Markel actually worked the hours he claims and what the rate should be

for those additional hours if they were worked" is unsupported by the record.

(AOB-41 (citing 5-ER-821 and 6-ER-962)).

*Second*, binding circuit precedent holds the ministerial exception bars breach

of contract claims challenging ministerial decisions. *Werft*, 377 F.3d at 1100,

1103-04 (ministerial exception bars pastor's claim for money damages on ground

church allegedly breached his contract by failing to accommodate his disability);

*Bollard*, 196 F.3d at 950 ("had Bollard brought a state law claim for breach of

contract with an associated remedy of reinstatement, that would run afoul of the

Free Exercise Clause because the remedy would require the church to employ

Bollard, thereby interfering with the church's constitutionally protected choice of

its ministers").  Markel does not address these aspects of *Werft* or *Bollard*.

Markel's reliance on *Sumner* for the contrary principle is misplaced.  First, because

they have not been overruled in an en banc decision, *Werft* and *Bollard* are binding

precedent in this Circuit.  *Ross Island Sand & Gravel v. Matson*, 226 F.3d 1015,

1018 (9th Cir. 2000).  Second, *Sumner* held that the plaintiff's *tort* claims were

barred by the ministerial exception, reasoning "[w]ere we to allow the acts taken in

terminating Sumner to be framed as tortious acts, we would render the ministerial

exception meaningless."  *Sumner*, 27 Cal. App. 5th at 596.  Because Markel's

claims sound in tort not contract, his claims are barred even under *Sumner*.  Third,

as *Sumner* acknowledged, 27 Cal. App. 5th at 589-90, another intermediate

California court held, like *Werft* and *Bollard*, that the ministerial exception bars

breach of contract claims challenging ministerial decisions.  *Schmoll v. Chapman*

*Univ.*, 70 Cal. App. 4th 1434, 1444 (1999).

Next, Markel contends (AOB-48–53) that *Alcazar II* held that the plaintiff's

overtime claim was barred only because to defeat it the church would have to

"justify why it does or does not pay its trainees for portions of their religious

training." (AOB-51).  Not so.  *Alcazar II* adopted the portion of *Alcazar I* holding

the ministerial exception applies "broadly to employment decisions regarding ministers," including "the determination of a minister's salary," and rejecting the plaintiff's contention that "the decision whether to pay him overtime wages is not the sort of religious practice the First Amendment shields from secular examination." *Alcazar I*, 598 F.3d at 674, adopted as relevant on rehearing en banc, *Alcazar II*, 627 F.3d at 1290 (ellipsis, emphasis, and quotation marks omitted)). Although Rosas' complaint may have survived the motion to dismiss if it could be read as alleging that "the church hired Rosas for maintenance purposes *independent of* his participation in the seminary program," that "reading is incorrect." *Alcazar II* at 1292-93 (emphasis added). Instead, Rosas' complaint "challenge[d] the church's wages for his duties as a seminarian," which included "maintenance and assisting with mass," and "[f]airly read, Rosas' complaint alleges that he performed those duties *as part of his seminary training*." *Alcazar II*, 627 F.3 at 1292 (emphasis added). Thus, it was simply because "Rosas challenges the sufficiency of his wages for duties performed as part of his seminary training" that "the ministerial exception applies to those claims." *Id*. at 1293. *Alcazar II* did not hold or suggest that the ministerial exception bars claims for unpaid overtime only where the church must articulate a religious justification to defeat them.

Next, Markel contends that "the First Amendment does not exempt religious

institutions from laws that regulate the minimum wage or the use of child labor."

(AOB-53–54 (quoting *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 795

(9th Cir. 2005) (Fletcher, J., concurring in denial of rehearing en banc) (citing

*Emp. Div. v. Smith*, 494 U.S. 872, 888 (1990), *Tony and Susan Alamo Foundation*

*v. Sec'y of Labor*, 471 U.S. 290 (1985), and *Prince v. Massachusetts*, 321 U.S. 158

(1944))).  But Judge Fletcher's choice of citations confirms that he did not mean

for his language to apply to *ministerial decisions*, correctly so: *Emp. Div.* involved

an individual's claimed right to unemployment benefits for loss of employment

due to religiously inspired peyote use, 474 U.S. at 874; *Alamo Foundation* "deals

only with lay employees," *Alcazar I*, 598 F.3d at 674; and *Prince* deals only with

Jehovah's Witness parents and their children.  *Prince*, 321 U.S. at 169-70.

Next, Markel contends that his claims for intentional and negligent

misrepresentation are not barred, relying on an extra-circuit case for the alleged

proposition that "[t]he Ministerial Exception does not apply to fraud claims."

(AOB-69 (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006)).

Markel's contention fails.  *First*, as explained above, Markel's claims are barred

under binding Ninth Circuit precedent because they interfere with the Orthodox

Union's "tangible employment actions" of (1) whether to "hir[e]" him, *Elvig*, 375

F.3d at 960-61, and (2) "the determination of [his] salary," *Alcazar I*, 598 F.3d at

674, and he impermissibly seeks remedies based on those tangible employment

actions in the form of damages for lost "salary and benefits" and for "mental and emotional distress." *Elvig*, 375 F.3d at 966. *Second*, *Petruska* held that the plaintiff's claim of fraudulent misrepresentation was properly dismissed because she failed to plead it with requisite specificity. *Petruska*, 462 F.3d at 310. *Petruska* thus explicitly did not address whether the claim was barred by the Establishment Clause. *Id*. at 310-11. Although *Petruska* nonetheless addressed whether the claim was barred by the Free Exercise Clause, *id*. at 310, it is unclear why, because addressing that issue was just as unnecessary to the judgment. And the binding holdings in *Alcazar I* and *Elvig*, that the ministerial exception bars claims challenging tangible employment actions, are based on both Establishment Clause and Free Exercise Clause principles. *Alcazar I*, 598 F.3d at 671-74; *Elvig*, 375 F.3d at 955-67.

If the Court seeks guidance from outside this Circuit on this issue, it should look to *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 942-45 (7th Cir. 2022), which is persuasive and consistent with this Circuit's precedent. When the defendant refused to renew the plaintiff minister's annual contract, she sued for intentional interference with contractual relationship and intentional interference with employment relationship under Indiana law. *Id*. at 938. *Starkey* surveyed this Circuit's and other courts of appeals' jurisprudence holding that state employment tort or contract claims are barred by the ministerial

62

exception. *Id.* at 942-44 (citing *Bollard*, 195 F.3d at 950, and *Elvig*, 375 F.3d at 966). *Starkey* then "follow[ed] the lead" of this Circuit and others to "hold that the ministerial exception applies to state law claims, like those for breach of contract and tortious conduct, that implicate ecclesiastical matters." *Id.* at 944. "A claim implicates ecclesiastical matters if it is '[o]f, relating to, or involving the church, esp[ecially] as an institution.'" *Ibid.* (brackets in original, citation omitted). The plaintiff's state-law claims "implicate ecclesiastical matters because they litigate the employment relationship between the religious organization and the employee." *Id.* at 944-45. Markel's claims for intentional and negligent misrepresentation similarly implicate ecclesiastical matters because they litigate the employment relationship between Markel and the Orthodox Union: whether the Orthodox Union tortiously promised but failed to "hire him to a salaried management position including a raise commensurate with the promotion." (6-ER-985; 6-ER-990).

Finally, Markel contends (AOB-70) that the district court erred in reasoning that "all of the employment-related decisions by the [Orthodox Union] implicated in each claim are barred by the 'ministerial exception,'" because "is it [sic] disputed that any 'employment-related decision' was ever made here." Markel's contention is nonsensical. The Orthodox Union decided to retain Markel as an independent contractor and decided on his compensation. These are "tangible

63

employment actions" covered by the ministerial exception. *Elvig*, 375 F.3d at 960-61 (ministerial exception covers decisions about "hiring" a minister); *Alcazar I*, 598 F.3d at 674 (ministerial exception covers "the determination of a minister's salary").

For these reasons, the district court correctly held that Markel's claims are barred.

### E.    Markel waived any appeal of Rabinowitz's judgment.

Markel waived any appeal of the district court's awarding judgment for Rabinowitz. *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 336 (9th Cir. 2017). In any event, the district court was correct. *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 837 (6th Cir. 2015); *Higgins v. Maher*, 210 Cal. App. 3d 1168, 1176 (1989).

## IX.    CONCLUSION

The judgment should be affirmed.

Date: October 12, 2023                    Respectfully submitted,

                                          JACKSON LEWIS P.C.


                                   By:   s/Dylan B. Carp
                                          Leonora M. Schloss
                                          Dylan B. Carp
                                          Attorneys for Defendants-Appellees
                                          UNION OF ORTHODOX JEWISH
                                          CONGREGATIONS OF AMERICA
                                          and NACHUM RABINOWITZ

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**   s/Dylan B. Carp _____   **Date**   October 12, 2023 _____

65

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance for Briefs

I am the attorney or self-represented party.

**This brief contains 13,996 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/Dylan B. Carp       **Date**   October 12, 2023

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

42 U.S.C. § 2000e-1(a) ............................................................................. 68

42 U.S.C. § 2000e-1(a): "This title [42 USCS §§ 2000e et seq.] shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

4854-1544-1521